**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2014

(Argued: January 29, 2015     Decided: September 20, 2016)

Docket No. 13-4791-cv

_____

IN RE: VITAMIN C ANTITRUST LITIGATION

ANIMAL SCIENCE PRODUCTS, INC., THE RANIS COMPANY, INC.,

*Plaintiffs-Appellees*,

- v. -

HEBEI WELCOME PHARMACEUTICAL CO. LTD., NORTH CHINA PHARMACEUTICAL
GROUP CORPORATION,

*Defendants-Appellants.*

_____

Before: CABRANES, WESLEY, and HALL, *Circuit Judges*.

Appeal from an order and final judgment of the United States District Court for the Eastern District of New York in favor of Plaintiffs and awarding damages and injunctive relief. Plaintiffs allege that Defendants engaged in price fixing and supply manipulation in violation of U.S. antitrust laws in connection with vitamin C exported from China. Because the Chinese Government filed a formal statement in the district court asserting that Chinese law required Defendants to set prices and reduce quantities of vitamin C sold abroad, and because Defendants could not simultaneously comply with Chinese law and U.S. antitrust laws, we **VACATE** the judgment, **REVERSE** on international comity

grounds the district court's denial of Defendants' motion to dismiss, and **REMAND** with instructions to dismiss Plaintiffs' complaint with prejudice. We do not address, except insofar as necessary to explain our rationale under the applicable principles of international comity, Defendants' additional defenses under the foreign sovereign compulsion, act of state, or political question doctrines.

VACATED, REVERSED, and REMANDED.

WILLIAM A. ISAACSON, Boies, Schiller & Flexner, LLP, Washington, D.C. (James T. Southwick, Shawn L. Raymond, Katherine Kunz, Susman Godfrey LLP, Houston, TX, Michael D. Hausfeld, Brian A. Ratner, Melinda Coolidge, Hausfeld LLP, Washington D.C., Brent W. Landau, Hausfeld LLP, Philadelphia, PA, *on the brief*), *for Plaintiffs-Appellees.*

JONATHAN M. JACOBSON, (Daniel P. Weick, Justin A. Cohen, *on the brief*), Wilson Sonsini Goodrich & Rosati, P.C., New York, NY (Scott A. Sher, Bradley T. Tennis, *on the brief*), Wilson Sonsini Goodrich & Rosati P.C., Washington, D.C., *for Defendants-Appellants*.

HALL, *Circuit Judge*:

This appeal arises from a multi-district antitrust class action brought against Defendants-Appellants Hebei Welcome Pharmaceutical and North China Pharmaceutical Group Corporation, entities incorporated under the laws of China. Plaintiffs-Appellees, Animal Science Products, Inc. and The Ranis

Company, Inc., U.S. vitamin C purchasers, allege that Defendants conspired to fix the price and supply of vitamin C sold to U.S. companies on the international market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 4, 16. This appeal follows the district court's denial of Defendants' initial motion to dismiss, *In re Vitamin C Antitrust Litig.*, 584 F. Supp. 2d 546 (E.D.N.Y. 2008) (Trager, *J.*), a subsequent denial of Defendants' motion for summary judgment, *In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d 522 (E.D.N.Y. 2011) (Cogan, *J.*),[1] and, after a jury trial, entry of judgment awarding Plaintiffs approximately $147 million in damages and enjoining the Defendants from engaging in future anti-competitive behavior. For the reasons that follow, we hold that the district court erred in denying Defendants' motion to dismiss.[2]

This case presents the question of what laws and standards control when U.S. antitrust laws are violated by foreign companies that claim to be acting at the express direction or mandate of a foreign government. Specifically, we

---

[1] District Judge David D. Trager passed away in January 2011, at which point this case was reassigned to District Judge Brian M. Cogan.

[2] Because we vacate the judgment and reverse the district court's denial of Defendants' motion to dismiss, we do not address the subsequent stages of this litigation nor the related arguments on appeal.

address how a federal court should respond when a foreign government, through its official agencies, appears before that court and represents that it has compelled an action that resulted in the violation of U.S. antitrust laws. In so doing we balance the interests in adjudicating antitrust violations alleged to have harmed those within our jurisdiction with the official acts and interests of a foreign sovereign in respect to economic regulation within its borders. When, as in this instance, we receive from a foreign government an official statement explicating its own laws and regulations, we are bound to extend that explication the deference long accorded such proffers received from foreign governments.

Here, because the Chinese Government filed a formal statement in the district court asserting that Chinese law required Defendants to set prices and reduce quantities of vitamin C sold abroad, and because Defendants could not simultaneously comply with Chinese law and U.S. antitrust laws, the principles of international comity required the district court to abstain from exercising jurisdiction in this case. Thus, we **VACATE** the judgment, **REVERSE** the district court's order denying Defendants' motion to dismiss, and **REMAND** with instructions to dismiss Plaintiffs' complaint with prejudice.

**BACKGROUND**[3]

For more than half a century, China has been a leading producer and exporter of vitamin C. In the 1970s, as China began to transition from a centralized state-run command economy to a market economy, the Chinese Government began to implement various export controls in order to retain a competitive edge over other producers of vitamin C on the world market. In the intervening years, the Government continued to influence the market and develop policies to retain that competitive edge. In the 1990s, for example, as a result of a reduction in vitamin C prices, the Government facilitated industry-wide consolidation and implemented regulations to control the prices of vitamin C exports. By 2001, Chinese suppliers had captured 60% of the worldwide vitamin C market.

In 2005, various vitamin C purchasers in the United States, including Plaintiffs Animal Science Products, Inc. and The Ranis Company, filed numerous

---

[3] We set forth here only those facts necessary to resolve the issues on appeal. Unless otherwise noted, the facts have been taken from the allegations in Plaintiffs' Second Amended Complaint, E.D.N.Y. Dkt. No. 1:06-md-1738, Doc. 179, which we accept as true for purposes of resolving a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 109 (2d Cir. 2011). For a more complete recitation of the facts, see the district court's November 6, 2008 Memorandum and Order. *See In re Vitamin C Antitrust Litig.*, 584 F. Supp. 2d 546 (E.D.N.Y. 2008).

suits against Defendants, Chinese vitamin C manufacturer Hebei Welcome Pharmaceutical Co. and its holding company, North China Pharmaceutical Group Corporation. These cases were transferred to the Eastern District of New York by the Judicial Panel on Multidistrict Litigation for coordinated or consolidated pretrial proceedings. The Plaintiffs allege, *inter alia*, that in December 2001 Defendants and their co-conspirators established an illegal cartel with the "purpose and effect of fixing prices, controlling the support of vitamin C to be exported to the United States and worldwide, and committing unlawful practices designed to inflate the prices of vitamin C sold to plaintiffs and other purchasers in the United States and elsewhere." E.D.N.Y. Dkt. No. 1:06-md-1738, Doc. 179 (Second Amended Complaint ("SAC")) ¶ 1. Specifically, Plaintiffs assert that Defendants colluded with an entity that has been referred to in this litigation as both the "Western Medicine Department of the Association of Importers and Exporters of Medicines and Health Products of China" and the "China Chamber of Commerce of Medicines & Health Products Importers & Exporters," (the "Chamber")[4] and agreed to "restrict their exports of Vitamin C in order to create

_____

[4] The parties explicitly disagree over the nature and authority of this entity. Plaintiffs characterize this entity as an "association" much like a trade association in the United States, while Defendants describe this entity as a government-

a shortage of supply in the international market." *Id.* ¶ 49. Plaintiffs allege that, from December 2001 to the time the complaint was filed, Defendants, their representatives, and the Chamber devised and implemented policies to address price cutting by market actors and to limit production levels and increase vitamin C prices with the intent to create a shortage on the world market and maintain China's position as a leading exporter. *Id.* ¶ 60.

Rather than deny the Plaintiffs' allegations, Defendants instead moved to dismiss on the basis that they acted pursuant to Chinese regulations regarding vitamin C export pricing and were, in essence, required by the Chinese Government, specifically the Ministry of Commerce of the People's Republic of China (the "Ministry"), to coordinate prices and create a supply shortage. Defendants argued that the district court should dismiss the complaint pursuant to the act of state doctrine, the doctrine of foreign sovereign compulsion, and/or principles of international comity. In an historic act, the Ministry filed an *amicus curiae* brief in support of Defendants' motion to dismiss.[5]

controlled "Chamber" of producers, unique to China's state-controlled regulatory regime.

[5] As Judge Trager noted, the Ministry's appearance in this case is historic because it is the first time any entity of the Chinese Government has appeared *amicus*

In its brief to the district court, the Ministry represented that it is the highest authority within the Chinese Government authorized to regulate foreign trade. The Ministry explained that the Chamber, which Plaintiffs refer to as an "association," is entirely unlike a "trade association" or the "chamber of commerce" in the United States and, consistent with China's state-run economy, is a "Ministry-supervised entity authorized by the Ministry to regulate vitamin C export prices and output levels." Joint App'x at 153. The Ministry's *amicus* brief describes the Chamber as follows:

> To meet the need of building the *socialist market economy* and *deepening the reform of foreign economic and trade management system*, the China Chamber of Commerce of Medicines & Health Products Importers & Exporters was established in May 1989 in an effort to boost the sound development of foreign trade in medicinal products. As a social body formed along business lines and enjoying the status of legal person, the Chamber is composed of economic entities registered in the People's Republic of China dealing in medicinal items as authorized by the departments under the [S]tate Council responsible for foreign economic relations and trade as well as organizations empowered by them. *It is designated to coordinate import and export business* in *Chinese and Western medicines* and provide service for its member enterprises. Its over 1100 members are scattered all over China. The Chamber abides by the state laws and administrative statutes, *implements its policies and regulations governing foreign trade, accepts the guidance and supervision of the responsible*

*curiae* before any U.S. court. On appeal, the Ministry also appears *amicus curiae* before this Court.

8

> *departments under the States Council. The very purpose is to coordinate and supervise the import and export operations in this business, to maintain business order and protect fair competition, to safeguard the legitimate rights and interests of the state, the trade and the members and to promote the sound development of foreign trade in medicinal items.*

Joint App'x at 157 n.10 (emphasis in original). According to the Ministry, the Chamber was an instrumentality of the State that was required to implement the Ministry's administrative rules and regulations with respect to the vitamin C trade.[6]

In support of Defendants' motion to dismiss, the Ministry also provided evidence of two Ministry-backed efforts by the Chamber to regulate the vitamin C industry: (1) a vitamin C Subcommittee ("the Subcommittee") created in 1997 and (2) a "price verification and chop" policy ("PVC") implemented in 2002. The Chamber created the Subcommittee to address "intense competition and challenges from the international [vitamin C] market." Joint App'x at 159. Before 2002, only companies that were members of the Subcommittee were allowed to export vitamin C. Under this regime, a vitamin C manufacturer qualified for the

---

[6] In an annex to its brief to the district court, the Ministry provided the Mitnick Declaration, which contained a copy of all regulations cited by the Ministry. The Ministry noted that all documents were properly authenticated consistent with Rule 902(3) of the Federal Rules of Evidence, which governs the self-authentication of foreign documents.

Subcommittee and was granted an "export quota license" if its export price and volume was in compliance with the Subcommittee's coordinated export price and export quota. In short, the Ministry explained to the district court that it compelled the Subcommittee and its licensed members to set and coordinate vitamin C prices and export volumes.

In 2002, the Chamber abandoned the "export quota license" regime and implemented the PVC system, which the Ministry represented was in place during the time of the antitrust violations alleged in this case. To announce the new regime, the Ministry issued an official notice, a copy of which is attached to the Ministry's brief in support of Defendants' motion to dismiss. This document, hereinafter "the 2002 Notice," explains that the Ministry adopted the PVC regime, among other reasons, "in order to accommodate the new situations since China's entry into [the World Trade Organization], maintain the *order* of market competition, make active efforts to avoid anti-dumping sanctions imposed by foreign countries on China's exports, promote industry self-discipline and facilitate the healthy development of exports." Special App'x 301. The 2002 Notice, furthermore, refers to "industry-wide negotiated prices" and states that "PVC procedure shall be convenient for exporters while it is conducive for the

chambers to coordinate export price and industry self-discipline." Special App'x 302. According to the Ministry, under this system, vitamin C manufacturers were required to submit documentation to the Chamber indicating both the amount and price of vitamin C it intended to export. The Chamber would then "verify" the contract price and affix a "chop," i.e., a special seal, to the contract, which signaled that the contract had been reviewed and approved by the Chamber. A contract received a chop only if the price of the contract was "at or above the minimum acceptable price set by coordination through the Chamber." Joint App'x 164. Manufacturers could only export vitamin C if their contracts contained this seal. The Ministry asserted that under the PVC regime, Defendants were required to coordinate with other vitamin C manufacturers and agree on the price that the Chamber would use in the PVC regime. In short, the Ministry represented to the district court that all of the vitamin C that was legally exported during the relevant time was required to be sold at industry-wide coordinated prices.

Defendants moved to dismiss the complaint based on the act of state doctrine, the defense of foreign sovereign compulsion, and the principle of international comity. The district court (Trager, *J.*) denied the motion in order to

allow for further discovery with respect to whether Defendants' assertion that the actions constituting the basis of the antitrust violations were compelled by the Chinese Government. In the district court's view, the factual record was "simply too ambiguous to foreclose further inquiry into the voluntariness of defendants' actions." *In re Vitamin C Antitrust Litig.*, 584 F. Supp. 2d at 559.

After further discovery, Defendants moved for summary judgment asserting the same three defenses that were the basis for their motion to dismiss. *In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d at 525–26. The district court (Cogan, *J.*) considered the evidence submitted by Defendants and the Ministry and accepted the Ministry's explanation as to its relationship with the Chamber, but "decline[d] to defer to the Ministry's interpretation of Chinese law" because the Ministry failed "to address critical provisions" of the PVC regime that "undermine[d] [the Ministry's] interpretation of Chinese law." *Id.* at 551. The district court further reasoned that pursuant to Federal Rule of Civil Procedure 44.1 ("Rule 44.1"), when interpreting Chinese law it had "substantial discretion to consider different types of evidence" beyond the Ministry's official statements, including, for example, the testimony of Plaintiffs' expert witness, a scholar of Chinese law. *Id.* at 561. The district court denied Defendants' motion for

summary judgment because it determined that "Chinese law did not compel Defendants' anticompetitive conduct" in any of the relevant time periods. *Id.* at 567.

The case ultimately went to trial. In March 2013, a jury found Defendants liable for violations of Section 1 of the Sherman Act. The district court awarded Plaintiffs approximately $147 million in damages and issued a permanent injunction barring Defendants from further violating the Sherman Act. This appeal followed.

**DISCUSSION**

The central issue that we address is whether principles of international comity required the district court to dismiss the suit. As part of our comity analysis we must determine whether Chinese law required Defendants to engage in anticompetitive conduct that violated U.S. antitrust laws. Within that inquiry, we examine the appropriate level of deference to be afforded a foreign sovereign's interpretation of its own laws. We hold that the district court abused its discretion by not abstaining, on international comity grounds, from asserting jurisdiction because the court erred by concluding that Chinese law did not require Defendants to violate U.S. antitrust law and further erred by not

extending adequate deference to the Chinese Government's proffer of the interpretation of its own laws.

**A. Standard of Review**

We review for abuse of discretion a district court's denial of a motion to dismiss on international comity grounds. *JP Morgan Chase Bank v. Altos Hornos de Mexico*, 412 F.3d 418, 422 (2d Cir. 2005). An abuse of discretion "occurs when (1) the court's decision rests on an error of law or clearly erroneous factual finding, or (2) its decision cannot be located within the range of permissible decisions." *CBS Broad. Inc. v. FilmOn.com, Inc.*, 814 F.3d 91, 104 (2d Cir. 2016) (alterations and internal quotation omitted). The determination of foreign law is "a question of law, which is subject to *de novo* review." *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara ("Pertamina")*, 313 F.3d 70, 80 (2d Cir. 2002) (internal quotation omitted). In determining foreign law, "we may consider any relevant material or source, including the legal authorities supplied by the parties on appeal as well as those authorities presented to the district court below." *Carlisle Ventures, Inc. v. Banco Espanol de Credito, S.A.*, 176 F.3d 601, 604 (2d Cir. 1999); *see* Fed. R. Civ. P. 44.1.

**B. International Comity**

Defendants argue that the district court erred by not dismissing Plaintiffs' complaint on international comity grounds. Comity is both a principle guiding relations between foreign governments and a legal doctrine by which U.S. courts recognize an individual's acts under foreign law. *See In re Maxwell Commc'n Corp.*, 93 F.3d 1036, 1046 (2d Cir. 1996). "Comity, in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." *Hilton v. Guyot*, 159 U.S. 113, 163–64 (1895) (internal quotations omitted). "[I]t is the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Id*. This doctrine "is not just a vague political concern favoring international cooperation when it is in our interest to do so [but r]ather it is a principle under which judicial decisions reflect the systemic value of reciprocal tolerance and goodwill." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court of S. Dist. of Iowa*, 482 U.S. 522, 555 (1987). While we approach Defendants' international comity defense from the "legal sense," we do not lose sight of the broader principles

underlying the doctrine. *See JP Morgan Chase Bank*, 412 F.3d at 423 ("Whatever its precise contours, international comity is clearly concerned with maintaining amicable working relationships between nations, a shorthand for good neighbourliness, common courtesy and mutual respect between those who labour in adjoining judicial vineyards." (internal quotation omitted)). Our analysis reflects an obligation to balance "the interests of the United States, the interests of the foreign state, and those mutual interests the family of nations have in just and efficiently functioning rules of international law." *In re Maxwell Commc'n Corp.*, 93 F.3d at 1048.

The principles of comity implicate a federal court's exercise of jurisdiction. *O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.*, 830 F.2d 449, 452 (2d Cir. 1987). Defendants do not dispute that the district court had subject matter jurisdiction over Plaintiffs' claims, *see Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993) (collecting cases) ("[I]t is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States."); rather, Defendants argue that principles of international comity required the district court to abstain from exercising that jurisdiction here, *see O.N.E. Shipping Ltd.*, 830 F.2d at 452

("Congress left it to the courts to decide when to employ notions of abstention from exercising jurisdiction in extraterritorial antitrust cases."); *see also* H.R. Rep. No. 97-686, at 13 (1982) ("If a court determines that the requirements for subject matter jurisdiction are met, [the Foreign Trade Antitrust Improvements Act[7]] would have no effect on the court['s] ability to employ notions of comity . . . or otherwise to take account of the international character of the transaction.").

To determine whether to abstain from asserting jurisdiction on comity grounds we apply the multi-factor balancing test set out in *Timberlane Lumber Co. v. Bank of Am., N.T. & S.A.*, 549 F.2d 597, 614–15 (9th Cir. 1976) and *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1297–98 (3d Cir. 1979). *See O.N.E. Shipping Ltd.*, 830 F.2d at 451–52 (noting that "[t]he comity balancing test has been explicitly used in this Court"). Both *Timberlane Lumber* and *Mannington Mills* addressed the unique international concerns that are implicated by exercising jurisdiction over antitrust violations that occur abroad and that involve the laws and regulations of a foreign nation. *See Timberlane Lumber Co.*,

---

[7] "Under § 402 of the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"), the Sherman Act does not apply to conduct involving foreign trade or commerce, other than import trade or import commerce, unless 'such conduct has a direct, substantial, and reasonably foreseeable effect' on domestic or import commerce." *Hartford Fire*, 509 U.S. at 796 (quoting 15 U.S.C. § 6a(1)(A)) (internal citations omitted).

549 F.2d at 613 ("[T]here is the additional question which is unique to the international setting of whether the interests of, and links to, the United States including the magnitude of the effect on American foreign commerce are sufficiently strong, vis-a-vis those of other nations, to justify an assertion of extraterritorial authority."); *Mannington Mills, Inc.*, 595 F.2d at 1296 ("When foreign nations are involved, however, it is unwise to ignore the fact that foreign policy, reciprocity, comity, and limitations of judicial power are considerations that should have a bearing on the decision to exercise or decline jurisdiction."). Combined and summarized here, the enumerated factors from *Timberlane Lumber* and *Mannington Mills* (collectively the "comity balancing test") guiding our analysis of whether to dismiss on international comity grounds include: (1) Degree of conflict with foreign law or policy; (2) Nationality of the parties, locations or principal places of business of corporations; (3) Relative importance of the alleged violation of conduct here as compared with conduct abroad; (4) The extent to which enforcement by either state can be expected to achieve compliance, the availability of a remedy abroad and the pendency of litigation there; (5) Existence of intent to harm or affect American commerce and its foreseeability; (6) Possible effect upon foreign relations if the court exercises

jurisdiction and grants relief; (7) If relief is granted, whether a party will be placed in the position of being forced to perform an act illegal in either country or be under conflicting requirements by both countries; (8) Whether the court can make its order effective; (9) Whether an order for relief would be acceptable in this country if made by the foreign nation under similar circumstances; and (10) Whether a treaty with the affected nations has addressed the issue. *Mannington Mills, Inc.*, 595 F.2d at 1297–98; *Timberlane Lumber Co.*, 549 F.2d at 614.

Since our adoption of the comity balancing test, the Supreme Court, in determining whether international comity cautioned against exercising jurisdiction over antitrust claims premised entirely on foreign conduct, relied solely upon the first factor—the degree of conflict between U.S. and foreign law—to decide that abstention was inappropriate. *Hartford Fire*, 509 U.S. at 798 ("The only substantial question in this litigation is whether there is in fact a true conflict between domestic and foreign law." (internal quotation omitted)). The Court explained that just because "conduct is lawful in the state in which it took place will not, of itself, bar application of the United States antitrust laws." *Id*. Thus, in that case, the degree of conflict between the laws of the two states had to rise to the level of a true conflict, i.e. "compliance with the laws of both countries

[must have been] impossible," to justify the Court's abstention on comity grounds. *Id.* at 799. In other words, "[n]o conflict exists . . . 'where a person subject to regulation by two states can comply with the laws of both.'" *Id.* (quoting Restatement (Third) of Foreign Relations Law § 403, cmt. e). After determining that there was not a true conflict, the Court reflected that there was "no need in this litigation to address other considerations that might inform a decision to refrain from the exercise of jurisdiction on the ground of international comity." *Id.*

We read *Hartford Fire* narrowly and interpret the modifying phrase "in this litigation" in reference to the "other considerations that might inform a decision" as suggesting that the remaining factors in the comity balancing test are still relevant to an abstention analysis. *Id.; see Mujica v. AirScan Inc.*, 771 F.3d 580, 600 (9th Cir. 2014) ("Since the majority did not address the 'other considerations' bearing on comity, the Court's *Hartford Fire* analysis 'left unclear whether it was saying that the only relevant comity factor *in that case* was conflict with foreign law . . . or whether the Court was more broadly rejecting balancing of comity interests in *any* case where there is no true conflict.'" (quoting Harold Hongju Koh, *Transnational Litigation in United States Courts* 80 (2008)). That a true conflict

was lacking in *Hartford Fire* does not, in the inverse, lead us to conclude that the presence of such a conflict alone is sufficient to require dismissal and thereby vitiate the need to consider the remaining factors.

Some courts, after *Hartford Fire*, have gone further and do not require a true conflict between laws before applying the remaining factors in the comity balancing test. *See, e.g.*, *Mujica*, 771 F.3d at 600 ("We think that *Hartford Fire* does *not* require proof of a 'true conflict' as a prerequisite for invoking the doctrine of comity, at least in a case involving adjudicatory comity."); *Freund v. Rep. of Fr.*, 592 F. Supp. 2d 540, 574 (S.D.N.Y. 2008) ("In post-*Hartford Fire* cases, conflict analysis has not been rigidly invoked to preclude consideration of the full range of principles relating to international comity." (citation omitted)). Similarly, we have not required a true conflict where a party does not invoke a prescriptive comity defense, "that is, where a party [does not] claim[] that it is subject to conflicting regulatory schemes," as Defendants do here. *Mujica*, 771 F.3d at 600; *see Bigio v. Coca-Cola Co.*, 448 F.3d 176, 178 (2d Cir. 2006) ("[T]he only issue of international comity properly raised here is whether adjudication of this case by a United States court would offend 'amicable working relationships' with Egypt." (citation omitted)). We need not, however, determine whether absent a

true conflict, the district court could have abstained from asserting jurisdiction on comity grounds because, in our view and as explained below, there is a true conflict between U.S. law and Chinese law in this case.

**C. True Conflict Analysis**

To determine whether Defendants could have sold and distributed vitamin C while in compliance with both Chinese and U.S. law, and thus whether a "true conflict" exists, we must determine conclusively what the law of each country requires.

The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. While this language has been interpreted to outlaw only unreasonable restraints in trade, *see, e.g., State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997), certain types of anticompetitive conduct are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality," *Nat. Soc. of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978). "Price-fixing agreements between two or more competitors, otherwise known as horizontal price-fixing agreements, fall into the category of arrangements that are *per se* unlawful." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Thus, if Chinese law required

Defendants to enter into horizontal price-fixing agreements, "compliance with the laws of both countries is [] impossible," *Hartford Fire*, 509 U.S. at 799, and there is a true conflict.

The Ministry, as *amicus*, has proclaimed on behalf of the Chinese Government that Chinese law, specifically the PVC regime during the relevant period, required Defendants, as manufacturers of vitamin C, to fix the price and quantity of vitamin C sold abroad. The Ministry mainly relies on the reference to "industry-wide negotiated prices" contained in the 2002 Notice to support its position. Plaintiffs, however, argue that the Ministry's statements are not conclusive and that because the 2002 Notice does not explicitly mandate price fixing, adherence to both Chinese law and U.S. antitrust law is possible. Our interpretation of the record as to Chinese law thus hinges on the amount of deference that we extend to the Chinese Government's explanation of its own laws.

**1. Standard of Deference**

There is competing authority on the level of deference owed by U.S. courts to a foreign government's official statement regarding its own laws and regulations. In the seminal case *United States v. Pink*, 315 U.S. 203 (1942), the

Supreme Court considered, *inter alia*, the extraterritorial reach of a 1918 decree nationalizing Russia's insurance business. The record before the *Pink* Court included expert testimony and "voluminous" other evidence bearing on the proper interpretation of the 1918 decree and its extraterritorial effect. *Id.* at 218. This evidence included an official declaration of the Russian Government explaining the intended extraterritorial effect of the decree. *See id.* at 219–20. The Court "d[id] not stop to review" the whole body of evidence, however, *id.* at 218, because it determined that the official declaration was "conclusive" as to the extraterritorial effect of the decree, *id.* at 220.

Since 1942, several courts have cited *Pink* for the proposition that an official statement or declaration from a foreign government clarifying its laws must be accepted as "conclusive." *See*, *e.g.*, *D'Angelo v. Petroleos Mexicanos*, 422 F. Supp. 1280, 1284 (D. Del. 1976), *aff'd*, 564 F.2d 89 (3d Cir. 1977) ("The principle of *Pink* requires this Court to accept the opinion of the attorney general of Mexico as an official declaration by that government that the effect of the expropriation decree was to extinguish Papantla's royalty and participating rights in the expropriated oil."); *Delgado v. Shell Oil Co.*, 890 F. Supp. 1324, 1363 (S.D. Tex. 1995), *aff'd*, 231 F.3d 165 (5th Cir. 2000) (accepting as conclusive an opinion issued

by the Department of Justice of the Republic of the Philippines and presented to the court articulating the scope and effect of a law of the Philippines); *but see Access Telecom, Inc. v. MCI Telecomms. Corp*, 197 F.3d 694, 714 (5th Cir. 1999), *cert. denied*, 531 U.S. 917 (2000) (holding, without citation to *Pink*, that "[t]he fact that U.S. courts routinely give deference to U.S. agencies empowered to interpret U.S. law and U.S. courts may give deference to foreign governments before the court does not entail that U.S. courts must give deference to all agency determinations made by all foreign agencies not before the court.").

Other courts, however, have intimated that while the official statements of a foreign government interpreting its laws are entitled to deference, U.S. courts need not accept such statements as conclusive. For example, in *Amoco Cadiz*, presented with conflicting interpretations of a French law, the Seventh Circuit held that "[a] court of the United States owes substantial deference to the construction France places upon its domestic law. . . . Giving the conclusions of a sovereign nation less respect than those of [a United States] administrative agency is unacceptable." *In re Oil Spill by the Amoco Cadiz*, 954 F.2d 1279, 1312 (7th Cir. 1992) (internal citations omitted).

The district court below, at the motion to dismiss stage, relied on three authorities—Rule 44.1, *Villegas Duran v. Arribada Beaumont*, 534 F.3d 142 (2d Cir. 2008), and *Karaha Bodas*, 313 F.3d 70—for the proposition that the Second Circuit, in particular, has "adopted a softer view toward the submissions of foreign governments." *In re Vitamin C Antitrust Litig.*, 584 F. Supp. 2d at 557. We disagree with this conclusion.

Contrary to the district court's reasoning, we find no support for the argument that Rule 44.1, adopted in 1966 long after *Pink* was decided, modified the level of deference that a U.S. court must extend to a foreign government's interpretation of its own laws. Rule 44.1 provides that, when determining foreign law, a court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. According to the advisory committee notes, the rule has two purposes: (1) to make a court's determination of foreign law a matter of law rather than fact, and (2) to relax the evidentiary standard and to create a uniform procedure for interpreting foreign law. Fed. R. Civ. P. 44.1 advisory committee's notes to 1966 adoption. The advisory committee notes suggest that Rule 44.1 was meant to address some of the challenges facing

litigants whose claims and defenses depended upon foreign law and to provide courts with a greater array of tools for understanding and interpreting those laws. *Id.* Rule 44.1 explicitly focuses on *what* a court may consider when determining foreign law, but it is silent as to *how* a court should analyze the relevant material or sources. Thus, courts must still evaluate the relevant source material within the context of each case. *See, e.g.*, *Curley v. AMR Corp.*, 153 F.3d 5, 14–15 (2d Cir. 1998) (explaining that because "Mexican law is much different" than New York state law and "its sources do not lie in precedent cases" the court must "consider the text of the constitution, civil code and statutory provisions . . . and give them preponderant consideration" when analyzing Mexican law). Finding no authority to the contrary, we conclude that Rule 44.1 does not alter the legal standards by which courts analyze foreign law, and thus, the rule does not abrogate or "soften" the level of deference owed by U.S. courts to statements of foreign governments appearing in U.S. courts.

The district court looked to our decision in *Villegas Duran* to bolster its conclusion that this court has adopted a softer view toward submissions of foreign governments. *In re Vitamin C Antitrust Litig.*, 584 F. Supp. 2d at 557. In *Villegas Duran* we declined to credit an affidavit from the Chilean Government

that clarified the appellant's child custody rights under Chilean law. 534 F.3d at 148 ("Reasons existed for the district court to refrain from giving the affidavit absolute deference."). We consider *Villegas Duran* inapplicable to the present case for two reasons. First, because the Chilean Government did not appear before the court in that case, either as a party or as an *amicus*, the level of deference the court afforded the Chilean affidavit does not guide our application here. Second, *Villegas Duran* was overturned by the Supreme Court, *Duran v. Beaumont*, 560 U.S. 921 (2010), in light of *Abbott v. Abbott*, 560 U.S. 1 (2010). In *Abbott*, the Court analyzed the same Chilean custody law at issue in *Villegas Duran* but found the very same affidavit from the Chilean Government that was submitted in *Villegas Duran* "notable" in its analysis of Chilean law and adopted Chile's interpretation of that law. *Abbott,* 560 U.S. at 10–11 ("[I]t is notable that a Chilean agency has explained that [the Chilean law] is a 'right to authorize the minors' exit' from Chile and that this provision means that neither parent can 'unilaterally' 'establish the [child's] place of residence.'" (internal quotation omitted)). To the extent that the majority's analysis in *Villegas Duran* suggests that a foreign sovereign's interpretation of its own laws warrants a lesser degree of deference, the Supreme Court's approach in interpreting Chilean law—relying, in part, on

the Chilean Government's affidavit—requires us to question, if not reject, *Villegas Duran* as precedent bearing on that issue.

Finally, the district court also relied on our decision in *Karaha Bodas*, 313 F.3d 70, to support its conclusion. In that case, a judgment creditor of an oil and gas company owned and controlled by the Republic of Indonesia sought to execute upon funds held in New York trust accounts. *Id.* at 71. The Republic of Indonesia joined the appeal as a party with an affected interest, and in so doing, sought to clarify the applicable Indonesian law as well as the Indonesian Government's relationship with the gas company. *Id*. Citing to our sister circuits in *Amoco Cadiz* and *Access Telecom*, we credited the Republic of Indonesia's interpretation and explained that "a foreign sovereign's views regarding its own laws merit—although they do not command—some degree of deference." *Id*. at 92. We clarified that, "where a choice between two interpretations of ambiguous foreign law rests finely balanced, the support of a foreign sovereign for one interpretation furnishes legitimate assistance in the resolution of interpretive dilemmas." *Id.*

It is noteworthy that, while we suggested in *Karaha Bodas* that deference to a foreign sovereign's interpretation need not be "conclusive" in every case, we

ultimately adopted the Republic of Indonesia's interpretation of its own regulation.[8] Indeed, we have yet to identify a case where a foreign sovereign appeared before a U.S. tribunal and the U.S. tribunal adopted a reading of that sovereign's laws contrary to that sovereign's interpretation of them.

Consistent with our holding in *Karaha Bodas* and the Supreme Court's pronouncements in *Pink*, we reaffirm the principle that when a foreign government, acting through counsel or otherwise, directly participates in U.S. court proceedings by providing a sworn evidentiary proffer regarding the construction and effect of its laws and regulations, which is reasonable under the circumstances presented, a U.S. court is bound to defer to those statements. If deference by any measure is to mean anything, it must mean that a U.S. court not embark on a challenge to a foreign government's official representation to the court regarding its laws or regulations, even if that representation is inconsistent with how those laws might be interpreted under the principles of our legal system. *Cf. Abbott*, 560 U.S. at 20 ("Judges must strive always to avoid a common

---

[8] Although we adopted the Republic of Indonesia's "reading of the relevant Indonesian law," we declined to accept fully Indonesia's argument on appeal because it had "not identified any Indonesian statute or regulation" in support of its position. *Karaha Bodas*, 313 F.3d at 92. To the extent there is no documentary evidence or reference of law proffered to support a foreign sovereign's interpretation of its own laws, deference may be inappropriate.

tendency to prefer their own society and culture, a tendency that ought not interfere with objective consideration . . . ."); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 430 (1964) (recognizing, among other things, that the "basic divergence between the national interests of capital importing and capital exporting nations and between the social ideologies of those countries that favor state control of a considerable portion of the means of production and those that adhere to a free enterprise system" creates "disagreements as to [the] relevant international legal standards" such that inquiring into the validity of a foreign sovereign's actions is barred by the state action doctrine). Not extending deference in these circumstances disregards and unravels the tradition of according respect to a foreign government's explication of its own laws, the same respect and treatment that we would expect our government to receive in comparable matters before a foreign court. *Cf. Hilton v. Guyot*, 159 U.S. 113, 191 (1895) (explaining that the rule of reciprocity should "work itself firmly into the structure of our international jurisprudence"); *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int-l B.V.*, 809 F.3d 737, 743 (2d Cir. 2016) ("The declaration of a United States court that the executive branch of the Russian government violated its own law . . . would be an affront to the government of a

foreign sovereign."); *Villegas Duran*, 534 F.3d at 153 (Wesley, *J.*, dissenting) (explaining that "this Court's practice of giving some deference to a foreign sovereign's view of its own law" and "careful attention" to the interpretation of foreign law is exactly what "we would expect . . . of a [foreign] court" in a reciprocal situation).

## 2. Applying Deference to the Ministry's Brief

The official statements of the Ministry should be credited and accorded deference. On that basis, we conclude, as Defendants and the Ministry proffer, that Chinese law required Defendants to engage in activities in China that constituted antitrust violations here in the United States.

The 2002 Notice, *inter alia*, demonstrates that from 2002 to 2005, the relevant time period alleged in the complaint, Chinese law required Defendants to participate in the PVC regime in order to export vitamin C. This regulatory regime allowed vitamin C manufacturers the export only of vitamin C subject to contracts that complied with the "industry-wide negotiated" price. Although the 2002 Notice does not specify how the "industry-wide negotiated" price was set, we defer to the Ministry's reasonable interpretation that the term means what it suggests—that members of the regulated industry were required to negotiate

and agree upon a price. It would be nonsensical to incorporate into a government policy the concept of an "industry-wide negotiated" price and require vitamin C manufacturers to comply with that minimum price point if there were no directive to agree upon such a price. Moreover, while on their face the terms "industry self-discipline," "coordination," and "voluntary restraint" may suggest that the Defendants were not required to agree to "industry-wide negotiated" prices, we defer to the Ministry's reasonable explanation that these are terms of art within Chinese law connoting the government's expectation that private actors actively self-regulate to achieve the government's policy goals in order to minimize the need for the government to resort to stronger enforcement methods.[9] In this context, we find it reasonable to view the entire PVC regime as a decentralized means by which the Ministry, through the Chamber, regulated the export of vitamin C by deferring to the manufacturers and adopting their agreed upon price as the minimum export price. In short, by directing vitamin C manufacturers to coordinate export prices and quantities and adopting those

[9] Similarly, while the documentary evidence shows that when China transitioned from the export quota regime to the PVC regime the role of the Subcommittee within China's regulatory framework changed from a governmental group whose membership was mandatory to a non-governmental trade organization whose membership was voluntary, we again defer to the Ministry's reasonable interpretation that the PVC regime required industry-wide coordination of prices regardless of whether membership in the Subcommittee was required.

standards into the regulatory regime, the Chinese Government required Defendants to violate the Sherman Act. *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940) ("[I]t is [] well settled that conspiracies under the Sherman Act are not dependent on any overt act other than the act of conspiring.").

We reiterate that deference in this case is particularly important because of the unique and complex nature of the Chinese legal- and economic-regulatory system and the stark differences between the Chinese system and ours. As the district court recognized, "Chinese law is not as transparent as that of the United States or other constitutional or parliamentary governments." *In re Vitamin C Antitrust Litig.*, 584 F. Supp. 2d at 559. China's legal system is distinct from ours in that "[r]ather than codifying its statutes, the Chinese government [] frequently governs by regulations promulgated by various ministries . . . . [and] private citizens or companies may be authorized under Chinese regulations to act in certain circumstances as government agents." *Id*. Moreover, the danger that "an interpretation suggested by the plain language of a governmental directive may not accurately reflect Chinese law" is all the more plausible where the documents the district court relied upon are translations and use terms of art which are

unique to the Chinese system. *In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d at 542. Deferring to the Ministry's explanation of what is legally required under its system is all the more important where, as here, the record evidence shows a clear disparity between China's economic regulatory regime and our own.

Instead of viewing the ambiguity surrounding China's laws as a reason to defer to the Ministry's reasonable interpretation, the district court, recognizing generally the unique features of China's system, attempted to parse out Defendants' precise legal role within China's complex vitamin C market regulatory framework.[10] Noting the discrepancies between China's interpretations of its laws and Plaintiffs' contrary reading of the underlying regulations, the district court determined that, because "[i]t is not clear from the record at this stage of the case whether defendants were performing [a] government function, whether they were acting as private citizens pursuant to governmental directives or whether they were acting as unrestrained private citizens[,]" further inquiry into the voluntariness of Defendants' actions was warranted. *In re Vitamin C Antitrust Litig.*, 584 F. Supp. 2d at 559. Specifically, the

[10] We note that if the Chinese Government had not appeared in this litigation, the district court's careful and thorough treatment of the evidence before it in analyzing what Chinese law required at both the motion to dismiss and summary judgment stages would have been entirely appropriate.

district court found problematic the possibility that the "defendants [made] their own choices and then ask[ed] for the government's imprimatur." *Id.*

The problems with the district court's approach were threefold. First, it determined that whether Chinese law compelled Defendants' anticompetitive conduct depended in part on whether Defendants petitioned the Chinese Government to approve and sanction such conduct. Second, it relied on evidence that China's price-fixing laws were not enforced to conclude that China's price fixing laws did not exist. And third, it determined that if Chinese law did not compel the exact anticompetitive conduct alleged in the complaint, then there was no true conflict.

Whether Defendants had a hand in the Chinese government's decision to mandate some level of price-fixing is irrelevant to whether Chinese law actually required Defendants to act in a way that violated U.S antitrust laws.[11] Moreover, inquiring into the motives behind the Chinese Government's decision to regulate the vitamin C market in the way it did is barred by the act of state doctrine. "In essence, the act of state doctrine is a principle of law designed primarily to avoid

---

[11] To use a domestic example, it would be equally inappropriate for a U.S. court, when analyzing U.S. insurance law, to inquire into the lobbying efforts of U.S. insurance companies for the purposes of determining whether U.S. insurance law applied to those companies.

judicial inquiry into the acts and conduct of the officials of the foreign state, its affairs and its policies and the underlying reasons and motivations for the actions of the foreign government." *O.N.E. Shipping Ltd.*, 830 F.2d at 452. The act of state doctrine precludes us from discrediting the Subcommittee or the PVC process as ad hoc protectionist regimes that were intended to provide governmental sanction to an otherwise privately formed cartel. By focusing on the Defendants' role in the regulatory regime, as opposed to the regime itself, the district court erroneously required Defendants to show that the government essentially forced Defendants to price-fix against their will in order to show that there was a true conflict between U.S. antitrust law and Chinese law. This demands too much. It is enough that Chinese law actually mandated such action, regardless of whether Defendants benefited from, complied with, or orchestrated the mandate. Thus, we decline to analyze why China regulated vitamin C in the manner it did and instead focus on what Chinese law required. *See id.* at 453.

Similarly, inquiring into whether the Chinese Government actually enforced the PVC regime as applied to vitamin C exports confuses the question of what Chinese law required with whether the vitamin C regulations were

enforced.[12] Plaintiffs argue that because there was extensive evidence that Defendants exported vitamin C without first obtaining the required chop and that Defendants sold vitamin C below the government floor price of $3.35/kg, the Chinese Government did not actually require compliance with the PVC regime. We are disinclined to view this factual evidence of China's unwillingness or inability to enforce the PVC regime as relevant to the PVC regime's legal mandate.

Finally, the district court made a conceptual error about the potential difference between foreign compulsion and a true conflict. The district court credited Plaintiffs' argument that because there was evidence that Defendants routinely agreed to export vitamin C at a price well above the agreed upon price of $3.35/kg, the Defendants alleged anticompetitive conduct was not compelled. But this conclusion misses the mark. Even if Defendants' specific conduct was not compelled by the 2002 Notice, that type of compulsion is not required for us to find a true conflict between the laws of the two sovereigns. It is sufficient "if compliance with the laws of both countries is impossible." *Hartford Fire*, 509 U.S.

---

[12] To use another domestic example, it would be inappropriate for a U.S. court, when analyzing whether U.S. labor laws required factory workers to wear safety masks, to examine evidence of how often factory owners were punished for such violations or how many factory owners actually complied with the safety mask regulations.

at 799. Whether Defendants, in fact, charged prices in excess of those mandated by the 2002 Notice does not weigh heavily into our consideration of whether the PVC regime, on its face, required Defendants to violate U.S. antitrust laws in the first instance.

Because we hold that Defendants could not comply with both U.S. antitrust laws and Chinese law regulating the foreign export of vitamin C, a true conflict exists between the applicable laws of China and those of the United States.

### D. Applying the Remaining Comity Factors

Having determined that Chinese law required Defendants to violate U.S. antitrust law, we now consider whether the remaining factors weigh in favor of dismissal based on principles of international comity. The district court, both at the motion to dismiss and the summary judgment stages, did not apply the remaining factors because it determined that Chinese law did not require price fixing. *In re Vitamin C Antitrust Litig.*, 584 F. Supp. 2d at 559; *In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d at 525–26. We need not remand the case to the district court for consideration of these factors in the first instance because the factors clearly weigh in favor of U.S. courts abstaining from asserting

jurisdiction. *See, e.g.*, *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 132 (2d Cir. 2013) (while "[i]t is ordinarily appropriate for us to vacate the judgment of a district court and remand the" case, "where a record is fully developed and it discloses that, in our judgment, only one possible resolution" of the remaining issue would be permissible "there is no reason to remand").

The remaining factors in the comity balancing test are: (1) nationality of the parties, locations or principal places of business of corporations; (2) relative importance of the alleged violation of conduct here compared to that abroad; (3) the extent to which enforcement by either state can be expected to achieve compliance, the availability of a remedy abroad and the pendency of litigation there; (4) existence of intent to harm or affect American commerce and its foreseeability; (5) possible effect upon foreign relations if the court exercises jurisdiction and grants relief; (6) if relief is granted, whether a party will be placed in the position of being forced to perform an act illegal in either country or be under conflicting requirements by both countries; (7) whether the court can make its order effective; (8) whether an order for relief would be acceptable in this country if made by the foreign nation under similar circumstances; and (9) whether a treaty with the affected nations has addressed the issue. *Mannington*

*Mills, Inc.*, 595 F.2d at 1297–98; *Timberlane Lumber Co.*, 549 F.2d at 614. Applying the test here, we hold that these remaining factors decidedly weigh in favor of dismissal and counsel against exercising jurisdiction in this case.

All Defendants are Chinese vitamin C manufacturers with their principle places of business in China, and all the relevant conduct at issue took place entirely in China. Although Plaintiffs may be unable to obtain a remedy for Sherman Act violations in another forum, complaints as to China's export policies can adequately be addressed through diplomatic channels and the World Trade Organization's processes. Both the U.S. and China are members of the World Trade Organization and are subject to the same rules on export restrictions. Moreover, there is no evidence that Defendants acted with the express purpose or intent to affect U.S. commerce or harm U.S. businesses in particular. Rather, according to the Ministry, the regulations at issue governing Defendants' conduct were intended to assist China in its transition from a state-run command economy to a market-driven economy, and the resulting price-fixing was intended to ensure China remained a competitive participant in the global vitamin C market and to prevent harm to China's trade relations. While it was reasonably foreseeable that China's vitamin C policies would generally have

41

a negative effect on Plaintiffs as participants in the international market for vitamin C, as noted above, there is no evidence that Defendants' antitrust activities were specifically directed at Plaintiffs or other U.S. companies.

Furthermore, according to the Ministry, the exercise of jurisdiction by the district court has already negatively affected U.S.-China relations. *See* Joint App'x at 1666, U.S. Vitamin Fine "unfair and inappropriate" Says Mofcom, Global Competition Review, Katy Oglethorpe, March 21, 2013 (quoting the Chinese government as stating that the district court's judgment "will cause problems for the international community and international enterprises, and will eventually harm the interests of the United States due to the increase in international disputes"). The Chinese Government has repeatedly made known to the federal courts, as well as to the United States Department of State in an official diplomatic communication relating to this case, that it considers the lack of deference it received in our courts, and the exercise of jurisdiction over this suit, to be disrespectful and that it "has attached great importance to this case."[13] Doc. No. 111, Diplomatic Correspondence between Embassy for the People's Republic

---

[13] We take judicial notice of the diplomatic communication from the Embassy of the People's Republic of China to the United States State Department dated April 9, 2014. *Sprague & Rhodes Commodity Corp. v. Instituto Mexicano Del Café*, 566 F.2d 861, 862 (2d Cir. 1977). The Ministry's motion as to the diplomatic communication is denied as moot.

of China and the United States Department of State, April 9, 2014; *cf. Société Nationale Industrielle Aérospatiale*, 482 U.S. at 546 ("[W]e have long recognized the demands of comity in suits involving foreign states, either as parties or as sovereigns with a *coordinate interest* in the litigation." (emphasis added)).

Currently, the district court's judgment orders Defendants to comply with conflicting legal requirements. This is an untenable outcome. It is unlikely, moreover, that the injunctive relief the Plaintiffs obtained would be enforceable in China. If a similar injunction were issued in China against a U.S. company, prohibiting that company from abiding by U.S. economic regulations, we would undoubtedly decline to enforce that order. *See Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion Y Produccion*, No. 13-4022, 2016 WL 4087215 (2d Cir. Aug. 2, 2016) ("[A] final judgment obtained through sound procedures in a foreign country is generally conclusive . . . *unless* . . . enforcement of the judgment would offend the public policy of the state in which enforcement is sought." (internal quotation omitted)).

Simply put, the factors weigh in favor of abstention. Recognizing China's strong interest in its protectionist economic policies and given the direct conflict between Chinese policy and our antitrust laws, we conclude that China's

"interests outweigh whatever antitrust enforcement interests the United States may have in this case as a matter of law." *O.N.E. Shipping Ltd.*, 830 F.2d at 450. Accordingly, we hold that the district court abused its discretion by failing to abstain on international comity grounds from asserting jurisdiction, and we reverse the district court's order denying Defendants' motion to dismiss. [14]

We further note that while we abstain from adjudicating Plaintiffs' claims with respect to the Defendants' conduct, the Plaintiffs are not without recourse to the executive branch, which is best suited to deal with foreign policy, sanctions, treaties, and bi-lateral negotiations. Because we reverse and remand for dismissal on the basis of international comity, we do not address the act of state, foreign sovereign compulsion, or political question defenses.

## CONCLUSION

According appropriate deference to the Ministry's official statements to the district court and to this Court on appeal, we hold that Defendants were required

---

[14] We note that it may not be reasonable in all cases to abstain on comity grounds from asserting jurisdiction at the motion to dismiss stage and that a trial court may need the opportunity to consider the countervailing interests and policies on the record that follows discovery. In this case, however, dismissal is appropriate because, after limited discovery, the record before the court at the motion to dismiss stage was sufficient to determine what Chinese law required and whether abstention was appropriate.

by Chinese law to set prices and reduce quantities of vitamin C sold abroad and doing so posed a true conflict between China's regulatory scheme and U.S. antitrust laws such that this conflict in Defendants' legal obligations, balanced with other factors, mandates dismissal of Plaintiffs' suit on international comity grounds. Accordingly, we **VACATE** the district court's judgment entered November 27, 2013, **REVERSE** the order of November 11, 2008, denying Defendants' motion to dismiss, and **REMAND** with instructions to dismiss Plaintiffs' complaint with prejudice.