16‐3303‐cv(L) 
Petersen Energía Inversora, S.A.U., et al. v. Argentine Republic, et al. 

 UNITED STATES COURT OF APPEALS 
 FOR THE SECOND CIRCUIT 

            

 August Term 2016  

 (Argued:  June 15, 2017  Decided:  July 10, 2018) 

 Docket Nos. 16‐3303‐cv(L), 16‐3304‐cv(Con) 
            

 PETERSEN ENERGÍA INVERSORA S.A.U. AND PETERSEN ENERGÍA, S.A.U., 

 Plaintiffs‐Appellees, 

 v. 

 ARGENTINE REPUBLIC AND YPF S.A., 

 Defendants‐Appellants.* 

            

 ON APPEAL FROM THE UNITED STATES DISTRICT COURT 
 FOR THE SOUTHERN DISTRICT OF NEW YORK 

            
Before: 
 WINTER, CALABRESI, AND CHIN, Circuit Judges. 
            

                                              
 *   The Clerk of Court is directed to amend the official caption to conform to 
the above. 
  
 
 Appeal from an order of the United States District Court for the 

Southern District of New York (Preska, J.), denying defendants‐appellantsʹ 

motion to dismiss under (1) Federal Rule of Civil Procedure 12(b)(1) for lack of 

subject matter jurisdiction on grounds of foreign sovereign immunity and  

(2) Federal Rule of Civil Procedure 12(b)(6) pursuant to the act of state doctrine. 

 AFFIRMED IN PART AND DISMISSED IN PART. 

 Judge WINTER concurs in part and dissents in part in a separate 
opinion. 

            

 MICHAEL K. KELLOGG (Mark C. Hansen, Derek T. 
 Ho, Benjamin S. Softness, on the brief), 
 Kellogg, Hansen, Todd, Figel & Frederick, 
 P.L.L.C., Washington, D.C., and Reginald R. 
 Smith, King & Spalding LLP, New York, 
 New York, for Plaintiﬀs‐Appellees.   

 MAURA BARRY GRINALDS, Skadden, Arps, Slate, 
 Meagher & Flom LLP, New York, New 
 York, and Martin Domb, Benjamin Joelson, 
 Ackerman LLP, New York, New York, for 
 Defendant‐Appellant Argentine Republic. 

 MICHAEL A. PASKIN, Cravath, Swaine & Moore 
 LLP, New York, New York, and Thomas J. 
 Hall, Marcelo M. Blackburn, Chadbourne & 
 Parke LLP, New York, New York, for 
 Defendant‐Appellant YPF S.A. 

          

 2 
 
CHIN, Circuit Judge: 

 Defendants‐appellants the Argentine Republic (ʺArgentinaʺ) and 

YPF S.A. (ʺYPFʺ) (together, ʺdefendantsʺ) appeal an order of the United States 

District Court for the Southern District of New York (Preska, J.), denying 

defendantsʹ motions to dismiss under (1) Federal Rule of Civil Procedure 12(b)(1) 

for lack of subject matter jurisdiction on grounds of foreign sovereign immunity 

and (2) Federal Rule of Civil Procedure 12(b)(6) pursuant to the act of state 

doctrine.  We aﬃrm the district courtʹs order insofar as it denied the motion to 

dismiss under the Foreign Sovereign Immunity Act and we dismiss defendantsʹ 

appeal as to the act of state doctrine. 

 BACKGROUND 

 Unless otherwise noted, the facts herein are undisputed.  They are 

drawn from the complaint and the documents submitted by the parties in 

reference to defendantsʹ motions to dismiss. 

I. YPF Becomes a Publicly Traded Company 

 YPF is a petroleum company that was wholly owned and operated 

by the Argentine government until 1993.  That year, in accordance with broader 

eﬀorts to reform its economy, Argentina decided to privatize the petrol firm 

through an initial public oﬀering (ʺIPOʺ) of nearly 100% of YPFʹs voting stock 
 3 
 
(the ʺsharesʺ).1  Argentina and YPF took a number of steps to entice investors to 

participate in the IPO and thereby ensure its success, two of which are 

particularly relevant to this case.  First, they arranged for YPF to oﬀer shares in 

the United States as American Depository Receipts (ʺADRsʺ) listed on the New 

York Stock Exchange (ʺNYSEʺ).  Second, they amended YPFʹs bylaws ‐‐ that is, 

the contract governing the relationship among YPF, Argentina (in its capacity as 

a shareholder), and other YPF shareholders.  In particular, the bylaws were 

amended to incorporate protections for investors from (1) hostile takeovers and 

(2) attempts by Argentina to renationalize the company.  These takeover 

protections form the basis of this breach of contract dispute, and so we describe 

them in some detail. 

 Section 7(d) of the amended bylaws prohibits (with certain 

exceptions inapplicable here) the direct or indirect acquisition of YPF shares if 

                                              
   1 Indeed, an article written by the then‐Governor of the Central Bank of 
Argentina notes that ʺ[t]he reforms of the 1990s . . . included financial system reforms, 
liberalization of trade and the capital account, and far‐reaching public sector reforms,ʺ 
including ʺ[p]ublic sector reform, which substantially reduced the scope of 
[Argentinaʹs] public sector [and] entailed privatizing almost all of the major public 
enterprisesʺ in the country.  Pedro Pou, Argentinaʹs Structural Reforms of the 1990s, 37 
Fin. & Dev. 13, 13 (2000).  Privatizing Argentinaʹs major public enterprises had three 
main benefits:  ʺPublic subsidies to [the formerly public] enterprises were reduced or 
eliminated; the enterprisesʹ efficiency and provision of services improved dramatically; 
and funds became available to cover a substantial part of the government deficit while 
other reforms . . . were under way.ʺ  Id. 
 4 
 
the acquisition results in the acquirer controlling 15% or more of the shares, 

unless the acquirer makes a tender oﬀer for all of the outstanding shares in 

accordance with certain procedures and at a price determined by a formula in 

the bylaws.  Among the prescribed procedures, section 7(f) requires that any 

such tender oﬀer comply with the rules and regulations imposed by the 

governments and stock exchanges where YPFʹs shares are listed.  Because YPFʹs 

securities were to be listed on the NYSE, those conducting tender oﬀers in 

accordance with these shareholder protection measures would be compelled by 

section 7(f) to comply with NYSE and Securities and Exchange Commission 

(ʺSECʺ) rules and regulations.  Section 7(f)(iv) further obligates the acquirer to 

publish notice of its tender oﬀer ʺin the business section of the major newspapers 

. . . in the City of New York, U.S.A. and any other city where the shares [of YPF] 

shall be listed.ʺ  App. 340.  Perhaps most importantly for purposes of this appeal, 

section 28(A) of the bylaws extends the tender oﬀer requirement of sections 7(e) 

and 7(f) to: 

 all acquisitions made by the [Government of Argentina], 
 whether directly or indirectly, by any means or 
 instrument, of shares or securities of [YPF], 1) if, as a 
 consequence of such acquisition, the [Government] 
 becomes the owner, or exercises the control of, the 
 shares of [YPF], which, in addition to the prior holdings 

 5 
 
 thereof of any class of shares, represent, in the 
 aggregate, at least 49% of the capital stock [of YPF]; or 
 2) if the [Government] acquires at least 8% of class D 
 outstanding shares of stock, while withholding class A 
 shares of stock amounting at least to 5% of the capital 
 stock. 

App. 432.   

 The penalties for breaching these provisions are drastic.  Section 7(h) 

provides that ʺ[s]hares of stock and securities acquired in breach of [the tender 

oﬀer requirements] shall not grant any right to vote or collect dividends.ʺ  App. 

342.  And section 28(C) extends such treatment to shares acquired by Argentina, 

unless its breach is accidental.  In that case, ʺ[t]he penalties provided for in 

subsection (h) of Section 7 shall be limited . . . to the loss of the right to vote.ʺ  

App. 355.  At bottom, these shareholder protection measures appear to promise 

investors a compensated exit from their ownership position in the firm if 

Argentina were to decide to renationalize YPF.   

 Argentina and YPF touted these protections in the prospectus filed 

with the SEC in connection with the IPO.  That document stated that ʺ[u]nder 

[YPFʹs] By‐laws, in order to acquire a majority of [YPFʹs] capital stock . . . , the 

Argentine Government first would be required to make a cash tender oﬀer to all 

holders of [the shares] on terms and conditions specified in the By‐laws.ʺ  App. 

 6 
 
23.  The prospectus further stated that ʺany Control Acquisition carried out by 

the Argentine Government other than in accordance with th[at] procedure . . . 

will result in the suspension of the voting, dividend and other distribution rights 

of the shares so acquired.ʺ  Id. (alteration in original). 

 By all accounts, Argentinaʹs marketing eﬀorts worked.  YPF 

launched a successful IPO on June 29, 1993.  Through the sale of YPF securities, 

Argentina raised billions of dollars in investment capital with the largest share 

(more than $1.1 billion in total) coming from the sale of ADRs in the United 

States on the NYSE.  A firm called Repsol S.A. (ʺRepsolʺ) emerged from the IPO 

as YPFʹs majority shareholder.  Even after the IPO, however, Argentina 

continued to participate in YPFʹs corporate governance as a commercial actor.  It 

remained a holder of YPFʹs Class A shares, entitling it to elect at least one 

member of the firmʹs board of directors.  Argentina also retained a veto right over 

certain third‐party acquisitions of YPFʹs capital stock.  After the IPO, YPFʹs 

shares, via the ADRs, were traded publicly on the NYSE and other exchanges.   

 Plaintiﬀs‐appellees Petersen Energía Inversora, S.A.U. and Petersen 

Energía, S.A.U. (together, ʺPetersenʺ) entered the picture in 2008.  Between 2008 

and 2011, Petersen conducted a series of acquisitions and came to own 

 7 
 
approximately 25% of YPFʹs shares, held in the form of ADRs issued by the Bank 

of New York Mellon in New York City.  All of Petersenʹs acquisitions were made 

in accordance with YPFʹs bylaws, including the tender oﬀer provisions in section 

7.  The bulk of Petersenʹs shares were purchased from Repsol and their purchase 

was financed by Repsol and various financial institutions, which maintained a 

security interest in the stock as collateral.  As part of a shareholder agreement 

with Petersen, Repsol agreed to cause YPF to make biannual distributions of 90% 

of its profits to shareholders via dividends in accordance with section 25 of the 

bylaws.  Petersen often used these dividends to make payments on the loans it 

used to finance the purchase of YPF stock.   

 All of that changed in 2012.  Early that year, members of the 

Argentine government began publicly criticizing Repsolʹs and Petersenʹs 

management of YPF and started discussing the prospect of renationalizing the 

company.  The value of YPFʹs ADRs plummeted in response to this news.  To put 

what happened next in the appropriate context, it helps to understand a little 

about the mechanics of Argentine expropriation law. 

 8 
 
 II. Argentine Expropriation Law 

 Expropriation is the ʺgovernmental taking or modification of an 

individualʹs property rights.ʺ  Expropriation, BLACKʹS LAW DICTIONARY (10th ed. 

2014).  A ʺclassic exampleʺ is the governmentʹs condemnation of a parcel of land 

to make way for some public good, like a road.  Murr v. Wisconsin, 137 S. Ct. 

1933, 1939 (2017).  The enactment of land use regulations may also, in some cases, 

constitute an expropriation.  See id.  But these land‐based examples understate 

the breadth of a sovereignʹs power of expropriation, which can be vast.  That is so 

because all types of property can be expropriated, whether tangible or intangible.  

Personal property, airspace rights, contract rights, even the shares of a 

corporation ‐‐ at least in theory, a sovereign can expropriate them all.  See Penn 

Cent. Transp. Co. v. City of New York, 438 U.S. 104, 128 (1978) (discussing a ʺtakingʺ 

of airspace rights); accord August Reinisch, Expropriation, in The Oxford Handbook 

of International Investment Law 407, 410 (Peter Muchlinski et al. eds., 2008) (ʺIt is 

generally asserted that expropriation may aﬀect not only tangible property but 

also a broad range of intangible assets of economic value to an investor.  Property 

that may be expropriated by states thus comprises immaterial rights and 

interests, including in particular contractual rights.ʺ).  In reality, however, 

 9 
 
whether a government may expropriate property, what property is subject to 

expropriation, and how much the government must compensate the individual it 

expropriated the property from (if at all) are largely questions of law of the 

expropriating nation.  Leo T. Kissam & Edmond K. Leach, Sovereign Expropriation 

of Property and Abrogation of Concession Contracts, 28 Fordham. L. Rev. 177, 184 

(1959) (ʺStates are at liberty to carry out . . . expropriations in the manner and 

form they consider best; . . . they are free to operate their municipal system of 

property according to their own national genius . . . .ʺ); compare Org. for Econ. 

Co‐operation & Dev., ʺIndirect Expropriationʺ and the ʺRight to Regulateʺ in 

International Investment Law, in International Investment Law:  A Changing Landscape 

43, 43‐72 (2005) (discussing limits imposed on expropriations by customary 

international law).  In this case, we look to Argentine law.  See Garb v. Republic of 

Poland, 440 F.3d 579, 594‐98 (2d Cir. 2006). 

 Article 17 of Argentinaʹs National Constitution sets the conditions 

under which property may be expropriated by the Argentine government.  To 

eﬀectuate an expropriation consistent with Article 17, two conditions must be 

met:  (1) the Argentine Congress must declare a public use for the property to be 

expropriated and (2) the owner of the property must be compensated.  The 

 10 
 
Argentine government has passed laws to clarify what property is subject to 

expropriation and to specify the procedures that must be followed to meet the 

conditions for expropriation.   

 One such law is Law 21,499, known as the ʺGeneral Expropriation 

Law.ʺ  App. 57.  It empowers, among other entities, the Argentine Federal 

Government to act as an expropriator.  As for the declaration of public use 

required by Article 17 of the National Constitution, section 5 of the General 

Expropriation Law clarifies that the Argentine Congress ʺshall particularly refer 

to specific propertyʺ to be expropriated in its declaration and section 1 provides 

that ʺ[p]ublic use, which is required as legal grounds for expropriation, 

comprises all cases where public welfare may be involved.ʺ  App. 185‐86.  The 

law further declares that ʺ[a]ll such property as may be convenient or necessary 

to satisfy [that] ʹpublic useʹ purpose, whatever the legal nature thereof, whether 

publicly or privately owned, or be they things or not, may be subject to 

expropriation . . . .ʺ  App. 186.  As for compensation for that property, section 10 

of the General Expropriation Law provides that the owner shall receive ʺthe 

objective value of the property plus any direct and immediate damages resulting 

from expropriation,ʺ such amounts to be fixed by agreement of the owner and 

 11 
 
expropriator or pursuant to a court proceeding.  App. 187.  And, presumably to 

prevent the ownerʹs malfeasance while compensation is being fixed, section 16 of 

the law proclaims that ʺ[n]o contract executed by the owner after the eﬀective 

date of the law declaring the expropriation of the property and which may imply 

the creation of any right or interest in the property shall be good as against the 

expropriator.ʺ  App. 187. 

 Accordingly, with this legal backdrop in mind, we return to how 

Argentina regained control over YPFʹs aﬀairs in the spring of 2012. 

III. Argentina Regains Control of YPF 

 On April 16, 2012, pursuant to the General Expropriation Law, 

Argentina proposed legislation that would expropriate directly from Repsol 51% 

of the voting stock of YPF.  On the same day, the Argentine National Executive 

Oﬃce decreed that it was empowering an ʺIntervenorʺ to seize immediate control 

of YPFʹs operations and to operate the company as a going concern while the 

Argentine Congress considered the expropriation legislation.  Action was swift.  

Indeed, before some of these measures were even announced publicly, the 

Intervenor seized control of YPFʹs facilities, replaced top management with 

government oﬃcials, and escorted YPFʹs then‐CEO oﬀ the premises.  The 

 12 
 
Intervenor also cancelled regularly‐scheduled meetings of YPFʹs board of 

directors and refused to make expected dividend payments. 

 Argentine oﬃcials were also quick to declare that, despite having 

acquired control of the company, Argentina and YPF had no intention of 

complying with the tender oﬀer provisions of YPFʹs bylaws.  For example, on 

April 17, 2012, in a speech before the Argentine Senate, the countryʹs Deputy 

Economy Minister described as ʺfools . . . those who think that the State has to be 

stupid and buy everyone according to YPFʹs own law, respecting its by‐law.ʺ  

App. 29 n.1.  He also dismissed the tender oﬀer requirements as ʺunfairʺ and a 

ʺbear trap.ʺ  Id. 

 On May 3, 2012, the proposed expropriation legislation was enacted 

as Law 26,741 with an eﬀective date of May 7, 2012 (the ʺYPF Expropriation 

Lawʺ).  In accordance with Article 17 of the National Constitution, the YPF 

Expropriation Law pronounced Argentinaʹs national public interest in achieving 

ʺself‐suﬃciency in hydrocarbon[] supply,ʺ App. 165, by, inter alia, integrating 

ʺpublic and private . . . capital into strategic alliances aimed at the exploration 

and exploitation of conventional and unconventional hydrocarbons,ʺ App. 166.  

The law further provided that: 

 13 
 
 to ensure the fulfillment of the objectives of this law, the 
 fifty‐one percent (51%) equity interest in YPF Sociedad 
 Anónima represented by the same percentage of Class 
 D shares of the said Company, held by Repsol YPF S.A., 
 its controlled or controlling entities, directly or 
 indirectly, is hereby declared to be of public use and 
 subject to expropriation. 

App. 167.  The YPF Expropriation Law also extended the Intervenorʹs control 

over the firmʹs operations and granted the Argentine executive branch the right 

to ʺexercise all the political rights over all the shares subject to expropriationʺ 

until the expropriation, including compensation of Repsol, was finalized.  App. 

167. 

 Argentina did indeed exercise the rights of Repsolʹs shares, using 

them to cancel YPFʹs previously‐scheduled dividend payment and board 

meeting in April 2012, and voted the shares at a shareholder meeting in June 

2012, in contravention of section 7(h) of the bylaws.  Unable to meet its loan 

obligations without the dividend payment, Petersen entered insolvency 

proceedings in July 2012 and its lenders foreclosed on the YPF ADRs that 

Petersen had pledged as collateral.  Repsol was eventually compensated for its 

expropriated shares to the tune of $4.8 billion.   

 14 
 
 IV. Procedural History 

 Petersen commenced this action in the district court on April 8, 2015, 

alleging, inter alia, breach of contract on grounds that (1) Argentina repudiated its 

obligation to make the tender oﬀer in accordance with sections 7(e) and (f) and 

28 of the bylaws, (2) YPF breached its obligation to ensure Argentina made such 

a tender oﬀer in light of its acquisition of Repsolʹs shares, and (3) YPF permitted 

Argentina to exercise the voting rights of Repsolʹs shares and other corporate 

governance powers in contravention of section 7(h) of the bylaws.  Defendants 

moved to dismiss the complaint, arguing, inter alia, that the district court lacked 

subject matter jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C. 

§ 1601 et seq. (the ʺFSIAʺ), and that Petersenʹs claims were barred by the ʺact of 

state doctrine.ʺ  As is relevant here, the district court denied defendantsʹ motions 

to dismiss with respect to the FSIA and act of state issues.  They timely appealed 

the FSIA ruling and the district court subsequently certified the act of state issue 

for our interlocutory review.   

 15 
 
 DISCUSSION 

 Two issues are presented.  First, we consider whether the federal 

courts have subject matter jurisdiction over this case under the FSIA.  Second, we 

address defendantsʹ arguments based on the act of state doctrine. 

I. Subject matter jurisdiction under the FSIA 

 A. Applicable law 

 Our jurisdiction over the district courtʹs FSIA ruling is premised on 

the collateral order doctrine, which ʺallows an immediate appeal from an order 

denying immunity under the FSIA.ʺ  Kensington Intʹl Ltd. v. Itoua, 505 F.3d 147, 

153 (2d Cir. 2007) (citation omitted).  We review de novo ʺa district courtʹs legal 

determinations regarding its subject matter jurisdiction, such as whether 

sovereign immunity exists,ʺ and its factual determinations for clear error.  Filler 

v. Hanvit Bank, 378 F.3d 213, 216 (2d Cir. 2004).  ʺIn determining whether an 

exception to the FSIA applies, the district court can and should consider matters 

outside the pleadings relevant to the issue of jurisdiction,ʺ and we do the same 

on appeal.  Kensington, 505 F.3d at 153. 

 The FSIA ʺprovides the sole basis for obtaining jurisdiction over a 

foreign state in the courts of this country.ʺ  Argentine Republic v. Amerada Hess 

 16 
 
Shipping Corp., 488 U.S. 428, 443 (1989).  ʺThe Act states that a ʹforeign state shall 

be immune from the jurisdiction of the courts of the United States and of the 

States except as provided in sections 1605 to 1607.ʹʺ  Rogers v. Petroleo Brasileiro, 

S.A., 673 F.3d 131, 136 (2d Cir. 2012) (quoting 28 U.S.C. § 1604).  Here, the parties 

do not dispute that Argentina is a foreign state and YPF is an instrumentality of 

Argentina and therefore Petersen has ʺthe burden of going forward with 

evidence showing that, under exceptions to the FSIA, immunity should not be 

granted.ʺ  Kensington, 505 F.3d at 153 (citation omitted).  ʺWhere the plaintiff 

satisfies [its] burden that an FSIA exception applies, the foreign sovereign then 

bears the ultimate burden of persuasion that the FSIA exception does not apply.ʺ  

Swarna v. Al‐Awadi, 622 F.3d 123, 143 (2d Cir. 2010). 

 The exception relevant here, the commercial activity exception, 

provides as follows: 

 A foreign state shall not be immune from the 
 jurisdiction of courts of the United States . . . in any case 
 . . . in which the action is based [1] upon a commercial 
 activity carried on in the United States by the foreign 
 state; or [2] upon an act performed in the United States 
 in connection with a commercial activity of the foreign 
 state elsewhere; or [3] upon an act outside the territory 
 of the United States in connection with a commercial 
 activity of the foreign state elsewhere and that act 
 causes a direct effect in the United States. 

 17 
 
  
28 U.S.C. § 1605(a)(2).  As for these conditions ʺ[a] plaintiff need only show that 

one of [them] is met for the commercial activities exception to apply.ʺ  

Kensington, 505 F.3d at 154. 

 Below, the district court held that Petersenʹs claims satisfy the third 

condition, known as the ʺdirect‐effect clause.ʺ  To establish jurisdiction on that 

basis, the action must be ʺ(1) based . . . upon an act outside the territory of the 

United States; (2) that was taken in connection with a commercial activity of 

Argentina outside this country; and (3) that cause[d] a direct effect in the United 

States.ʺ  Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611 (1992) (alteration 

in original) (internal quotation marks omitted). 

 As to the first element, ʺwe must identify the act of the foreign 

sovereign State that serves as the basis for plaintiffsʹ claims.ʺ  Garb, 440 F.3d at 

586.  What matters for this inquiry is that the challenged ʺaction is ʹbased uponʹ 

the ʹparticular conductʹ that constitutes the ʹgravamenʹ of the suit.ʺ  OBB 

Personenverkehr AG v. Sachs, 136 S. Ct. 390, 396 (2015).  The Supreme Court has 

instructed us to ʺzero[] in on the core of [the plaintiffsʹ] suit:  the . . . acts that 

actually injured them.ʺ  Id.   

 18 
 
 As to the second element, ʺthe Act defines ʹcommercial activityʹ as 

ʹeither a regular course of commercial conduct or a particular commercial 

transaction or act,ʹ and provides that ʹ[t]he commercial character of an activity 

shall be determined by reference to the nature of the course of conduct or 

particular transaction or act, rather than by reference to its purpose.ʹʺ  Saudi 

Arabia v. Nelson, 507 U.S. 349, 358‐59 (1993) (quoting 28 U.S.C. § 1603(d)).  A state 

engages in ʺcommercial activity . . . only where it acts ʹin the manner of a private 

player withinʹ the marketʺ or, put differently, ʺwhere it exercises ʹonly those 

powers that can also be exercised by private citizens,ʹ as distinct from those 

ʹpowers peculiar to sovereigns.ʹʺ  Id. at 360.  For example, ʺa foreign stateʹs 

repudiation of a contract is precisely the type of activity in which a private player 

within the market engages.ʺ  De Csepel v. Republic of Hungary, 714 F.3d 591, 599 

(D.C. Cir. 2013) (citation and internal quotation marks omitted).  By contrast, 

ʺexpropriations . . . do not fall within the ʹcommercial activityʹ exception of the 

FSIA [because] [e]xpropriation is a decidedly sovereign ‐‐ rather than commercial 

‐‐ activity.ʺ  Garb, 440 F.3d at 586. 

 As to the third element, ʺa direct effect in the United States,ʺ ʺto be 

direct, an effect need not be substantial or foreseeable, but rather must simply 

 19 
 
follow[] as an immediate consequence of the defendantʹs . . . activity.ʺ  Atlantica 

Holdings, Inc. v. Sovereign Wealth Fund Samruk‐Kazyna JSC, 813 F.3d 98, 108 (2d 

Cir. 2016) (alteration in original) (internal quotation marks omitted).   

 B. Application 

 With these principles in mind, we turn to defendantsʹ arguments 

that this case does not fall within the FSIAʹs commercial activity exception.  We 

first consider Argentinaʹs contention that Petersenʹs claims are in fact based on 

sovereign acts, rather than commercial ones, and then we address YPFʹs 

arguments that it too is entitled to immunity under the FSIA. 

 1. Argentina 

 Argentina does not challenge the district courtʹs conclusion that its 

breach of the bylawsʹ tender offer requirements caused a direct effect in the 

United States.  And we agree with that conclusion because those provisions 

required Argentina to tender for ADRs listed on the NYSE and ʺcourts have 

consistently held that, in contract cases, a breach of a contractual duty causes a 

direct effect in the United States sufficient to confer FSIA jurisdiction [if] the 

United States is the place of performance for the breached duty.ʺ  Id. at 108‐09. 

 20 
 
 Instead, Argentina argues that Petersenʹs claims are ʺbased onʺ the 

sovereign act of expropriation, rather than any commercial activity, thereby 

rendering the FSIAʹs commercial activity exception inapplicable.  It premises this 

argument on three claims about the nature of Petersenʹs lawsuit.  First, Argentina 

asserts that the complaint misinterprets the bylaws, obscuring that the breach 

Petersen complains of is actually Argentinaʹs sovereign expropriation of Repsolʹs 

51% ownership stake in YPF, rather than the failure to conduct a tender offer.  

Second, Argentina contends that it could not have complied with both the YPF 

Expropriation Law and the bylawsʹ tender offer requirement because the former 

required Argentina to acquire 51% ownership of YPF and no greater amount.  

Third, Argentina characterizes Petersenʹs claims as an impermissible effort to 

ʺenforce the bylaws.ʺ  Argentina Reply Br. 2.  We discuss each argument, in turn. 

 Argentina first contends that the district court erred in accepting 

Petersenʹs interpretation that YPFʹs bylaws permitted Argentina to conduct a 

tender offer after it acquired a controlling interest in YPF.  According to 

Argentina, the bylaws instead required Argentina to acquire its majority 

ownership position through the tender offer process contemplated in the bylaws.  

Argentina, in this view, breached the bylaws (if at all) by acquiring Repsolʹs stock 

 21 
 
through the expropriation instead of a tender offer.  So understood, Petersenʹs 

lawsuit is not ʺbased onʺ Argentinaʹs commercial activity; rather, it is based on a 

decidedly sovereign act, i.e., the expropriation of Repsolʹs shares.  Consequently, 

Argentina argues that Petersenʹs lawsuit falls outside of the FSIAʹs commercial 

activity exception.   

 We are not persuaded.  Looking, as we must, to ʺthe core of [the 

plaintiffsʹ] suit,ʺ i.e., ʺthe . . . acts that actually injured them,ʺ OBB Personenverkehr, 

136 S. Ct. at 396, we conclude that Petersen seeks relief for injuries caused by 

commercial, rather than sovereign, activity.   

 To start, we agree with the district court that, under the bylaws, 

Argentinaʹs expropriation triggered an obligation to make a tender offer for the 

remainder of YPFʹs outstanding shares.  Argentinaʹs contrary interpretation, i.e., 

that the bylaws required Argentina to conduct a tender offer in order to acquire 

Repsolʹs 51% stake in YPF (meaning that the expropriation itself was Argentinaʹs 

breach, rather than its subsequent failure to make a tender offer) rests on a 

misreading of the bylaws.  To recap, section 28(A) of the bylaws provides in its 

totality that: 

 The provisions of subsections e) and f) of Section 7 
 (with the sole exception of the provisions of paragraph 

 22 
 
 B of the said Section) shall apply to all acquisitions 
 made by the National Government, whether directly or 
 indirectly, by any means or instrument, of shares or 
 securities of the Corporation, 1) if, as a consequence of 
 such acquisition, the National Government becomes the 
 owner [of], or exercises the control of, the shares of the 
 Corporation, which, in addition to the prior holdings 
 thereof of any class of shares, represent, in the 
 aggregate, at least 49% of the capital stock; or 2) if the 
 National Government acquires at least 8% of class D 
 outstanding shares of stock, while withholding class A 
 shares of stock amounting at least to 5% of the capital 
 stock provided for in subsection (a) of section 6 of these 
 By‐laws upon registration thereof with the Public 
 Registry of Commerce.  Should class A shares represent 
 a lower percentage than the one previously mentioned, 
 the provisions set forth in point 2) of this Section shall 
 not be applicable.  Instead, the general criteria set forth 
 in subsection d) of Section 7 shall apply. 

App. 432.  Admittedly, the wording of this bylaw is not a paragon of clarity, a 

defect that is no doubt exacerbated by the provisionʹs translation into English 

from the Spanish language original.  But we can divine its meaning if, for the 

sake of simplicity, we unpack some of the cross references and omit certain 

clauses that do not apply to this case.  Recall, for example, that the tender oﬀer 

requirements are found in ʺ[t]he provisions of subsections e) and f) of Section 7,ʺ 

App. 432, and that we are concerned only with Argentinaʹs expropriation of 

Repsolʹs 51% ownership stake.  With these facts in mind, section 28(A) can be 

fairly rephrased as follows:   
 23 
 
 The [obligation to make a tender oﬀer] shall apply to 
 [Argentinaʹs acquisition of YPFʹs shares] . . . by any 
 means or instrument . . . if, as a consequence of such 
 acquisition, [Argentina] becomes the owner [of], or 
 exercises the control of, . . . at least 49% of the capital 
 stock [of YPF] . . . . 

App. 432.  Simply put, section 28(A) compels Argentina to make a tender offer in 

accordance with the procedures set forth in the bylaws if ʺby any means or 

instrumentʺ it ʺbecomes the owner [of], or exercises the control of,ʺ at least 49% 

of YPFʹs capital stock.  App. 432 (emphasis added).   

 This interpretation is bolstered by the language of section 7(d), 

which determines whether acquirers other than Argentina must make a tender 

offer.  That bylaw provides that ʺ[i]f the terms of subsections e) and f) of this 

section are not complied with, it shall be forbidden to acquire shares or securities of 

the Corporation . . . if, as a result of such acquisition, the purchaser becomes the 

holder of,ʺ inter alia, ʺ[15%] or more of the capital stock.ʺ  App. 338 (emphasis 

added).  As the italicized language demonstrates, when the drafters of the 

bylaws, namely, YPF and Argentina, wanted to ensure that certain acquisitions 

would proceed only through a tender offer process, they used language that flatly 

forbade non‐conforming acquisitions.  By contrast, the absence of any similar 

prohibitory language in section 28(A) suggests that Argentinaʹs acquisition of a 

 24 
 
control position is different in that it merely triggers a separate obligation to 

make a tender offer.  In other words, in contrast to a hostile takeover by a private 

actor, Argentinaʹs acquisition of a control position, as such, did not have to be 

accomplished through the tender offer. 

 Under this reading of the contract, we conclude that Petersenʹs 

lawsuit is ʺbased onʺ Argentinaʹs breach of a commercial obligation.  The 

gravamen of Petersenʹs claim is that Argentina denied Petersen the benefit of the 

bargain promised by YPFʹs bylaws when Argentina repudiated its obligation to 

tender for Petersenʹs shares.  As the district court noted, when Argentina 

expropriated Repsolʹs 51% stake in YPF, it incurred the obligation under section 

28(A) of YPFʹs bylaws to make a tender offer for the remainder of YPFʹs 

outstanding shares.  That obligation and Argentinaʹs subsequent repudiation of it 

were indisputably commercial in nature in that they are ʺthe type of actions by 

which a private party engages in trade and traffic or commerce.ʺ  Weltover, 504 

U.S. at 614 (citation and internal quotation marks omitted); accord De Csepel, 714 

F.3d at 599 (ʺ[A] foreign stateʹs repudiation of a contract is precisely the type of 

activity in which a private player within the market engages.ʺ (citation and 

internal quotation marks omitted)).  Indeed, as noted above, the bylaws impose 

 25 
 
similar obligations on others who seek to acquire large ownership stakes in YPF, 

and the record shows that those commercial actors, including Petersen, 

conducted tender offers when so required.  Although Argentinaʹs obligation to 

conduct a tender offer in this case was triggered by its sovereign act of 

expropriation, see Garb, 440 F.3d at 586 (ʺExpropriation is a decidedly sovereign ‐‐ 

rather than commercial ‐‐ activity.ʺ), there is nothing unusual about conditioning 

a commercial obligation on the occurrence of a sovereign act, even when the 

sovereign itself is one of the parties to the contract, see, e.g., Guevara v. Republic of 

Peru, 468 F.3d 1289, 1300 (11th Cir. 2006) (discussing a hypothetical contract 

wherein a sovereign conditioned its payment on a contract ʺto buy bullets from a 

private manufacturer . . . on it declaring war on a neighbor before the scheduled 

date of deliveryʺ and concluding that ʺ[t]he condition precedent of a declaration 

of war . . . does not change the commercial nature of the acts of purchasing and 

payingʺ for the bullets); Restatement (Second) of Contracts § 264, ill. 3.  

Moreover, as the district court correctly observed, ʺ[t]he commercial contractual 

obligations at issue here could just as easily have been triggered by Argentinaʹs 

acquisition of a controlling stake in YPF in open‐market transactions.ʺ  S. App. 

 26 
 
17.  Accordingly, for these reasons, we conclude that Argentinaʹs breach of those 

obligations was a commercial act, not a sovereign one. 

 We turn next to Argentinaʹs contentions that (1) it could not have 

complied with both the bylaws and the YPF Expropriation Law at the time of its 

breach and (2) Petersenʹs lawsuit is an ex post facto attempt to ʺenforce the 

bylaws.ʺ  Argentina Reply Br. 2.  Both arguments fail.   

 As to the first argument, we see no reason why Argentina could not 

have complied with both the bylawsʹ tender offer requirements and the YPF 

Expropriation Law.  In support of its argument to the contrary, Argentina relies 

on the declaration of an expert witness who opines that ʺthe YPF Bylaws cannot 

validly restrict, limit, or in any way affect the exercise of sovereign powers of the 

National Government in general and regarding expropriations in particular.ʺ  

App. 214.  Because its expropriation powers trump the bylaws and ʺrequiring 

any post‐expropriation tender for the remaining YPF shares would be 

inconsistent with the [YPF] Expropriation Lawʹs requirement that Argentina 

acquire exactly 51% ownership in YPF,ʺ Argentina Br. 39, Argentina contends that 

it could not have complied with both obligations and thus the YPF Expropriation 

Law prevails.  Finally, Argentina avers that, pursuant to our opinion in In re 

 27 
 
Vitamin C Antitrust Litigation, 837 F.3d 175 (2d Cir. 2016), we must defer to its 

expertʹs interpretation of Argentine law.  Again, we are not persuaded. 

 Starting with the latter argument, In re Vitamin C Antitrust Litigation 

has now been reversed by the Supreme Court, in Animal Science Products, Inc. v. 

Hebei Welcome Pharmaceutical Co., 138 S. Ct. 1865 (2018).  The Supreme Court in 

Animal Science rejected our ruling in Vitamin C that federal courts are ʺbound to 

deferʺ to a foreign governmentʹs construction of its own law, 837 F.3d at 189, and 

instead held that ʺ[a] federal court should accord respectful consideration to a 

foreign governmentʹs submission, but is not bound to accord conclusive effect to 

the foreign governmentʹs statements.ʺ  Animal Sciences, 138 S. Ct. at 1869. 

 Here, even according respectful consideration to Argentinaʹs views, 

we do not find that the expertʹs interpretation supports Argentinaʹs argument 

that ʺany post‐expropriation tender for the remaining YPF shares would be 

inconsistent with the [YPF] Expropriation Lawʹs requirement that Argentina 

acquire exactly 51% ownership in YPF.ʺ  Argentina Br. 39.  In particular, there is 

no provision in the YPF Expropriation Law itself and no statement in the expertʹs 

opinion that the law compelled Argentina to ʺacquire exactly 51% ownership in 

YPFʺ and no greater ownership position.  Argentina Br. 39 (emphasis in original). 

 28 
 
 To the contrary, as noted above, the YPF Expropriation Law declares 

only that to ensure ʺself‐sufficiency in hydrocarbon[] supply,ʺ App. 165, and to 

integrate ʺpublic and private . . . capital into strategic alliances aimed at the 

exploration and exploitation of conventional and unconventional hydrocarbons,ʺ 

App. 166, ʺthe fifty‐one percent (51%) equity interest in YPF Sociedad Anónima 

represented by the same percentage of Class D shares of the said Company, held 

by Repsol YPF S.A., its controlled or controlling entities, directly or indirectly, is 

hereby declared to be of public use and subject to expropriation,ʺ App. 167.  The 

law further provides that YPF shall remain a publicly‐traded company after the 

expropriation and ʺshall not be subject to any legislation or regulation applicable 

to the administration, management and control of companies or entities partly 

owned by the national or provincial governmentsʺ of Argentina, confirming that 

YPF would continue its normal commercial activities after the expropriation.  

App. 169.  At bottom, the YPF Expropriation Law does not prohibit a post‐

expropriation tender oﬀer under YPFʹs bylaws; indeed, it says absolutely nothing 

about Argentinaʹs acquisition of additional YPF shares in a subsequent market 

transaction.   

 29 
 
 Similarly, Argentinaʹs expert opines only that (1) Argentinaʹs 

sovereign power of expropriation cannot be limited by private agreement, (2) 

ʺthe expropriation of YPF shares for reasons of public use . . . prevails over 

clauses in . . . a private corporate agreementʺ such as the bylaws, and (3) ʺin [his] 

opinion, [he did] not perceive, in the process of intervention of YPF or in the 

temporary occupation and subsequent expropriation of shares, that there was 

any violation of constitutional or legal norms under Argentine law.ʺ  App. 218.  

Again, none of these opinions support the proposition that Argentina was 

required by law to acquire exactly 51% of YPF, no more and no less.  

Accordingly, even if we were to accord deference to Argentinaʹs legal expert 

pursuant to In re Vitamin C Antitrust Litigation, we conclude that his opinion does 

not establish what Argentina says it does.  Although we are mindful of the 

deference we owe to foreign sovereigns as to the construction of their laws, we 

simply see no basis in the record for concluding that Argentina could not have 

complied with both the YPF Expropriation Law and the bylawsʹ tender offer 

requirements by launching a post‐expropriation tender offer. 

 As to Argentinaʹs last argument on the FSIA issue, it is unclear what 

Argentina means when it characterizes Petersenʹs lawsuit as an attempt to 

 30 
 
ʺenforce the bylaws.ʺ  Argentina Reply Br. 2.  To the extent that Argentina is 

suggesting that Petersen wants a court to order Argentina to conduct a tender 

offer now, such argument is baseless.  Petersenʹs complaint does not seek a 

specific performance remedy.  Nor could it for Petersen is no longer a YPF 

shareholder and therefore could not perform its obligation to tender shares in the 

event of a court‐ordered tender offer.  Restatement (Second) Contracts § 363, 

cmts. a & b (plaintiffʹs ability to perform its obligations under the contract is a 

prerequisite to a specific performance remedy).  Rather, Petersen merely seeks 

compensatory damages for Argentinaʹs breach of its tender offer obligation in 

2012.  The award of such damages would no more ʺenforce the bylawsʺ than an 

award of damages in any breach of contract case would enforce the contract 

forming the basis of the plaintiffʹs suit. 

 In sum, we conclude that when Argentina asserted control over 

Repsolʹs 51% stake in YPF via expropriation, it incurred a separate commercial 

obligation under the bylaws to make a tender offer for the remainder of YPFʹs 

outstanding shares.  Because Petersen claims it was injured by Argentinaʹs 

repudiation of that commercial obligation and we conclude that the repudiation 

was an act separate and apart from Argentinaʹs expropriation of Repsolʹs shares, 

 31 
 
we hold that Petersenʹs action against Argentina falls within the ʺdirect‐effects 

clauseʺ of the FSIA. 

 2. YPF 

 As a threshold matter, we note that although YPF became an 

instrumentality of Argentina by virtue of the expropriation of Repsolʹs shares, see 

28 U.S.C. § 1603(b)(2) (an ʺinstrumentality of a foreign stateʺ is, inter alia, ʺany 

entity . . . a majority of whose shares or other ownership interest is owned by a 

foreign stateʺ), that fact does not render all of its subsequent conduct ʺsovereign,ʺ 

rather than ʺcommercial,ʺ in nature.  See Gemini Shipping, Inc. v. Foreign Trade Org. 

for Chems. & Foodstuffs, 647 F.2d 317, 318‐20 (2d Cir. 1981) (noting that a foreign 

instrumentality can engage in commercial activity sufficient to bring such 

conduct within FSIAʹs commercial activity exception).  Instead, the inquiry 

remains whether YPF ʺact[ed] in the manner of a private player within the 

market,ʺ or whether ʺit exercise[d] . . . powers peculiar to sovereigns.ʺ Nelson, 507 

U.S. at 360 (citations and internal quotation marks omitted). 

 YPF raises two objections to maintaining subject matter jurisdiction 

over this case under the FSIA.  First, it argues that the gravamen of Petersenʹs 

claims against it is its alleged failure to stop Argentina from voting Repsolʹs 

 32 
 
expropriated shares and that such act was in compliance with Argentinaʹs 

sovereign expropriation and thus not a commercial activity.  Second, YPF 

contends that its failure to stop Argentina from exercising corporate governance 

powers conferred by Repsolʹs shares had no direct effect in the United States.   

 Petersen responds, correctly in our view, that YPFʹs arguments 

ignore that Petersen alleges two separate breaches of YPFʹs bylaws.  The 

complaint alleges that YPF breached the bylaws by (1) failing to enforce the 

bylawsʹ tender offer provisions vis‐à‐vis Argentina and (2) failing to enforce the 

penalties that section 7(h) imposes on shareholders who have breached their 

tender offer obligations.  As for Petersenʹs first theory of the case, we conclude 

that the claim against YPF falls within the ʺdirect‐effect clauseʺ of FSIAʹs 

commercial activity exception for the same reasons that the analogous claim 

against Argentina does.  That is, YPFʹs obligation to enforce the tender offer 

provision triggered by Argentinaʹs expropriation of Repsolʹs 51% ownership 

stake is commercial in nature ‐‐ indeed, every corporation is obligated to abide 

by its bylaws, see, e.g., Boilermakers Local 154 Ret. Fund v. Chevron Corp., 73 A.3d 

934, 938‐40 (Del. Ch. 2013) ‐‐ and YPFʹs failure to do so caused a direct effect in 

the United States, namely, the required tender for ADRs listed on the NYSE 

 33 
 
never took place.  See Atlantica Holdings, 813 F.3d at 108‐09 (ʺ[C]ourts have 

consistently held that, in contract cases, a breach of a contractual duty causes a 

direct effect in the United States sufficient to confer FSIA jurisdiction [if] the 

United States is the place of performance for the breached duty.ʺ).   

 As for Petersenʹs second theory of liability, we conclude that YPFʹs 

failure to enforce the penalties imposed by section 7(h) is of a piece with its 

failure to enforce the tender offer provisions.  Like those latter provisions, section 

7(h) implicates the commercial affairs of YPF, i.e., what voting rights attach to 

which shares and which shares are entitled to collect dividends, and thus its 

enforcement or non‐enforcement constitutes commercial activity.  To be sure, the 

YPF Expropriation Law granted Argentina the right to exercise the voting rights 

associated with Respsolʹs shares, but YPF has not explained how that fact 

transforms its own failure to enforce the bylaws into an exercise of ʺpowers 

peculiar to sovereigns.ʺ  Nelson, 507 U.S. at 360.  What is more, as noted, the YPF 

Expropriation Law explicitly stated that the firm would remain a publicly‐traded 

company, subject to laws applicable to private, rather than government‐owned 

companies.  This fact cuts against YPFʹs contention that it was somehow acting as 

a sovereign.  Furthermore, YPFʹs refusal to enforce section 7(h)ʹs penalties had a 

 34 
 
direct effect in the United States because (1) it enabled Argentina to cancel 

planned dividend payments, some of which would have been made to investors 

based in the United States, and (2) it precipitated Petersenʹs default on its loan 

obligations and the subsequent foreclosure of Petersenʹs ADRs, which were held 

by the Bank of New York Mellon in New York City.   

 Accordingly, we conclude that Petersenʹs claims against YPF also fall 

within the ʺdirect‐effect clauseʺ of the FSIAʹs commercial activity exception. 

 * * * 

 The thrust of defendantsʹ arguments on appeal is that Petersen has 

engaged in a form of artful pleading that we have previously rejected.  They 

contend that Petersen has re‐characterized Argentinaʹs expropriation of Repsolʹs 

shares as a commercial act, rather than a sovereign one, so as to trigger 

application of the FSIAʹs commercial activity exception.  See Garb, 440 F.3d at 588 

(ʺFederal courts have repeatedly rejected litigantsʹ attempts to establish subject 

matter jurisdiction pursuant to . . . FSIA exceptions when their claims are in 

essence based on disputed takings of property.ʺ).  Based on our review of the 

complaint and the record before us, however, we are satisfied that Petersen is not 

challenging the expropriation.   

 35 
 
 As noted above, Argentinaʹs expropriation powers are vast.  Indeed, 

it could have expropriated the entirety of YPF, some smaller portion of the firm 

such as the 25% stake owned by Petersen, or even just the contractual rights of 

shareholders to receive tender oﬀers in accordance with the bylaws.  Of course, 

had Argentina done any of these things, it would have been obligated by its own 

law to compensate Petersen for ʺthe objective value of the propertyʺ it 

expropriated, ʺplus any direct and immediate damages resulting from 

expropriation.ʺ  App. 187.  And we agree that a lawsuit based on such 

expropriations would fall outside of the FSIAʹs commercial activity exception.   

 Argentina, however, did not expropriate anything from Petersen.  To 

be sure, it did expropriate Repsolʹs 51% stake in YPF.  But, Petersen does not 

challenge that, or any other sovereign act.  Instead, Petersen wants a court to 

award it the benefit of the bargain that Argentina and YPF struck with each 

shareholder who purchased YPF shares on the open market.  Petersen claims that 

defendants repudiated that bargain when they refused to conduct a tender oﬀer 

in accordance with YPFʹs bylaws, despite having incurred the obligation to do so 

by virtue of Argentinaʹs acquisition of a controlling stake in the firm.  The 

ʺgravamenʺ of Petersenʹs lawsuit is thus the defendantsʹ repudiation of a contract 

 36 
 
that had a direct eﬀect in the United States.  OBB Personenverkehr, 136 S. Ct. at 

396.  Sovereigns are not immune from such lawsuits under the FSIA.  See 

Weltover, 504 U.S. at 614‐15. 

 The Act of State Doctrine 

 As noted, we have appellate jurisdiction over the issue of the 

defendantsʹ immunity from suit under the FSIA under the collateral order 

doctrine, pursuant to which the district courtʹs order denying such immunity 

was immediately appealable.  See Atlantica Holdings, 813 F.3d at 105.  By contrast, 

the district courtʹs denial of defendantsʹ motions to dismiss under the act of state 

doctrine, which were brought pursuant to Federal Rule of Civil Procedure 

12(b)(6), is not immediately appealable.  See Will v. Hallock, 546 U.S. 345, 351 

(2006); see also Balintulo v. Daimler AG, 727 F.3d 174, 186 (2d Cir. 2013) (ʺAs a 

general matter, denials of a motion to dismiss are not appealable as ʹfinal 

decisionsʹ of the district courts under 28 U.S.C. § 1291.ʺ).   

 Interlocutory orders that are otherwise non‐appealable, however, 

may be reviewed under 28 U.S.C. § 1292(b) if the district court is ʺof the opinion 

that [the relevant] order involves a controlling question of law as to which there 

is substantial ground for difference of opinion and that an immediate appeal 

 37 
 
from the order may materially advance the ultimate termination of the 

litigation.ʺ  28 U.S.C. § 1292(b); see McDonnell Douglas Fin. Corp. v. Penn. Power & 

Light Co., 849 F.2d 761, 764 (2d Cir. 1988).  If, as here, the district court certifies an 

appeal, the Court of Appeals may then, ʺin its discretion, permit an appeal to be 

taken from such order.ʺ  28 U.S.C. § 1292(b).   

 We exercise our discretion not to accept jurisdiction over this aspect 

of the appeal.  The act of state doctrine provides an affirmative defense and was 

raised below on a motion to dismiss pursuant to Rule 12(b)(6).  Dismissal was 

warranted only if the doctrineʹs applicability was ʺshown on the face of the 

complaint.ʺ  Konowaloff v. Metro. Museum of Art, 702 F.3d 140, 146 (2d Cir. 2012); 

accord Daventree Ltd. v. Republic of Azerbaijan, 349 F. Supp. 2d 736, 755 (S.D.N.Y. 

2004) (ʺAs a substantive rather than a jurisdictional defense, the Act of State 

doctrine is more appropriately raised in a motion for summary judgment than in 

a motion to dismiss.ʺ).  As discussed above, the face of Petersenʹs complaint 

makes clear that it is not challenging Argentinaʹs official acts ‐‐ the expropriation 

of property ‐‐ and the complaintʹs allegations that Argentina and YPF breached 

their obligations by failing to engage in a tender offer did not require the district 

court to rule on the validity of any of Argentinaʹs official acts.  At this juncture of 

 38 
 
the proceedings, the act of state doctrine does not present the kind of legal 

question that normally constitutes a ʺcontrolling question of law.ʺ  Whether the 

act of state doctrine bars Petersenʹs claims is a merits determination that turns on 

the facts.  In these circumstances, we decline to reach the issue.  Accordingly, we 

dismiss the portion of this appeal challenging the district courtʹs ruling on the 

defendantsʹ act of state defense.     

 CONCLUSION 

 For the foregoing reasons, we AFFIRM the district courtʹs order 

holding that Argentina and YPF are not immune from suit under the FSIA and 

DISMISS the portion of this appeal challenging the district courtʹs ruling on the 

defendantsʹ act of state defense. 

 39 
 
WINTER, Circuit Judge, concurring in part and dissenting in part: 

 I agree entirely with the excellent discussion and ruling as to 

whether FSIA immunizes Argentina and YPF.  I dissent from the disposition of 

the act‐of‐state issue. 

 Having rejected the Section 1292(b) motion that we hear an 

interlocutory appeal ‐‐ otherwise non‐appealable ‐‐ from the district courtʹs 

rejection on the pleadings of the act‐of‐state defense, my colleaguesʹ opinion is 

quite clear that we lack jurisdiction over the act‐of‐state issue.  It is less clear in 

stating that the reason for rejecting the motion is that the issue depends on 

ʺfacts.ʺ  The district court ruled that the facts alleged in the complaint stated a 

claim that was not subject to the act‐of‐state defense.  My colleaguesʹ conclusion 

that fact‐finding is needed to rule on the issue is a merits decision going to the 

nature and contours of the act‐of‐state defense.  Such a conclusion seems, 

therefore, inconsistent with the ruling that we lack jurisdiction over the issue.  

Because the reasons we give for rejecting FSIA immunity are that the harm to 

plaintiffs was not caused by a sovereign, rather than commercial, act of the 

Argentinian state, that portion of the opinionʹs reasoning also calls for a rejection 

of the act‐of‐state defense to the claim as alleged.    
 A brief review of the relevant procedural history is in order.  The 

defendants moved to dismiss the complaint on the basis that the district court 

lacked subject matter jurisdiction under the FSIA and that Petersenʹs claims were 

barred by the act‐of‐state doctrine.  The district court denied the defendantsʹ 

motion on both fronts.  The first issue ‐‐ FSIA immunity ‐‐ was immediately 

appealable under the collateral order doctrine.  Kensington Intʹl Ltd. v. Itoua, 505 

F.3d 147, 153 (2d Cir. 2007).  The rejection of the act‐of‐state defense was 

interlocutory and not immediately appealable.  The district court, believing the 

conditions of Section 1292(b) had been met, certified the appeal so that we could 

decide both issues in tandem.  Argentina and YPF then moved this court to grant 

leave for immediate appeal of the act‐of‐state issue.  2d Cir. Dkt. Nos. 16‐3510, 

16‐3512.  No opposition was filed to these motions.  The motions were referred to 

a motions panel, which then referred them to the merits panel –‐ this panel –‐ so 

that ʺ[t]hat panel can decide, in the first instance, whether the act‐of‐state issue is 

appropriate for immediate appeal pursuant to . . . § 1292(b).ʺ  Motion Order, 2d 

Cir. Dkt. No. 16‐3510 (Feb. 14, 2017).   

 Pursuant to 28 U.S.C. § 1292(b), we have discretion to allow an 

appeal to be taken from an order not otherwise appealable when the district 

 2 
 
judge states in writing ʺthat such order [1] involves a controlling question of law 

[2] as to which there is substantial ground for difference of opinion and [3] that 

an immediate appeal from the order may materially advance the ultimate 

termination of the litigation.ʺ (brackets added).  In my view, the established 

standards under Section 1292(b) are satisfied. 

 First, a controlling question of law is present.  Reversing the district 

courtʹs holding that the act‐of‐state doctrine ʺdoes not preclude inquiry into 

contractual obligations related to or arising out of [acts of expropriation],ʺ would 

result in dismissal of the case.  See Klinghoffer v. S.N.C. Achille Lauro, 921 F.2d 21, 

24 (2d Cir. 1990) (ʺ[I]t is clear that a question of law is ʹcontrollingʹ if reversal of 

the district courtʹs order would terminate the action.ʺ); In re Duplan Corp., 591 

F.2d 139, 148 n.11 (2d Cir. 1978).   

 Second, there is substantial ground for difference of opinion; in 

particular, whether Argentinaʹs obligation under the bylaws to make a tender 

offer was independent of Argentinaʹs sovereign acts of intervention and 

expropriation.   

 Finally, an immediate appeal would materially advance the ultimate 

termination of the case.  Judicial efficiency would be served by deciding both this 

 3 
 
issue and the FSIA question simultaneously.  My colleaguesʹ conclusion as to the 

lack of immunity under FSIA is that the facts alleged in the complaint do not 

state a claim that implicates a sovereign, rather than commercial, act of the 

Argentinian state.  This conclusion resolves both the FSIA issue and the act‐of‐

state defense.  Only a paragraph, if that, would be necessary to explain an 

affirmance of the certified appeal if we took jurisdiction.  We need say only that 

assertion of an act‐of‐state defense requires that a sovereign, rather than 

commercial, act has caused the harm to the plaintiffs, and no such act occurred 

here. 

 Instead, my colleagues deny the motion, hold that we lack appellate 

jurisdiction, and explain these rulings on the grounds that unspecified ʺfactsʺ are 

needed to adjudicate the act‐of‐state defense.  While the reason given suggests a 

remand for further proceedings, my colleaguesʹ jurisdictional ruling leaves the 

dismissal of the act‐of‐state defense in place and governed by the law of the case 

doctrine in the district court.  See Am. Hotel Intʹl Grp., Inc. v. OneBeacon Ins. Co., 

611 F. Supp. 2d 373, 378‐79 (S.D.N.Y. 2009) affʹd, 374 F. Appʹx 71 (2d Cir. 2010). 

 4 
 
 I therefore concur in the affirmance on the FSIA issue.  I dissent from 

the denial of the Section 1292(b) motion and would affirm the dismissal of the 

act‐of‐state defense to the claim alleged in the complaint.  

 5